United States Court of Appeals,

Eleventh Circuit.

No. 95-2848.

EPIC METALS CORP., a Pennsylvania Corporation, Plaintiff-Counter-Defendant-Appellee,

v.

Frank SOULIERE, Sr.; Condec, Inc., a Florida corporation, Defendants-Counter-Claimants-Appellants.

Nov. 6, 1996.

Appeal from the United States District Court for the Middle District of Florida. (No. 92-744-civ-T-17C), Elizabeth Jenkins, Judge.

Before COX, Circuit Judge, HILL, Senior Circuit Judge, and VINING[*], Senior District Judge.

HILL, Senior Circuit Judge:

Epic Metals Corporation (Epic) brought this action against Condec, Inc. (Condec) and its president, Frank Souliere, alleging trade dress infringement of EPICORE, Epic's composite steel floor deck profile, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[1] Following a bench trial, the magistrate judge[2] concluded that Condec had infringed upon Epic's trade dress.

---

[*]Honorable Robert L. Vining, Jr., Senior U.S. District Judge for the Northern District of Georgia, sitting by designation.

[1]The amended complaint alleged five counts: trade dress infringement (Count I); copyright infringement of promotional brochure 1 (Count II); copyright infringement of promotional brochure 2 (Count III); reverse passing off in violation of § 43(a) of the Lanham Act (Count IV); and unfair competition under state law (Count V). The magistrate judge awarded damages and permanent injunctive relief on Counts I, II, and III. Condec does not appeal the magistrate judge's dismissal of Counts IV and V.

[2]The parties consented to proceed before the magistrate judge. 28 U.S.C. § 636(c), Fed.R.Civ.P. 73.

Asserting that this conclusion is not supported by the evidence presented at trial, Condec appeals. We agree and reverse Condec's liability on this claim. In all other respects, we affirm.[3]

## I. BACKGROUND

Steel decking, together with wire mesh, poured concrete, and frequently rebar, form a composite steel deck system. The steel deck component provides a form for the poured concrete. As the concrete hardens, the steel deck lends positive reinforcement and structural support. Up until the late 1960's, a generic form of steel deck, called Type B steel deck, was commonly used by the construction industry.

In 1968 Epic developed EPICORE as an alternative to Type B deck. Although Epic owns a federally registered trademark for the name EPICORE, EPICORE is not patented. Its profile, as viewed from the end of the sheet steel after it has been formed, by bending, into EPICORE, is twenty-four and one-half inches wide, two inches deep, with dovetail-bent troughs spaced six and one-eighth inches on center. EPICORE's roll-formed sheets are characterized by these dovetail ribs, whose formation requires that the steel sheeting be bent over ninety degrees:[4]

CA(96)5736-1,SIZE-15 PICAS,TYPE-PDI

The tooling required to form the steel into this profile is more

---

[3]A second issue raised by Condec on appeal, that the magistrate judge abused her discretion in denying its newly-appointed counsel a second continuance of trial, is without merit. Her award of damages and injunctive relief as to Counts II and III is affirmed without opinion. *See* 11th Cir.R. 36-1.

[4]In contrast, in forming Type B deck ribs, the sheet steel bending is not reversed and is bent approximately sixty degrees.

complex than that required to form Type B decking.  In addition the dovetail ribs take more sheet steel to form.  As a result EPICORE uses thirty percent more raw steel sheeting than Type B decking. Thus, as to both labor and material, EPICORE is more expensive to produce.[5]

Dovetail is defined as "resembling a dove's tail ... the flaring tendon and a mortise into which it fits tightly making an interlocking joint between two pieces."  Webster's Seventh New Collegiate Dictionary, G. & C. Merriam Company (Springfield, MA 1965).  When concrete is poured onto EPICORE, its dovetail ribs, together with the concrete, create the flaring tendon and a mortise.  After the concrete hardens, the EPICORE composite floor system becomes an interlocking joint.  It is illustrated as:

CA(96)5736-2,SIZE-14 PICAS,TYPE-PDI

A three-dimensional cross-section of EPICORE is depicted as:

CA(96)5736-3,SIZE-12 PICAS,TYPE-PDI

For a ten-year period, Condec's president, Souliere, was an Epic distributor.[6]  In late 1988, Souliere and Condec developed its own steel deck product with a dovetail profile.  They named it CONDEC.  Souliere and Condec do not deny that CONDEC's profile mimics EPICORE's profile.  Both have the same dimensions.  Both have dovetail ribs bent over ninety degrees.  Epic claims that, at first glance, and from a distance, CONDEC appears identical to

---

[5]Epic has approximately a two percent share of the United States composite steel deck market.  It sells EPICORE directly and through a network of independent distributors and concentrates on those responsible for specifying construction materials and systems, *i.e.,* engineers and architects.

[6]1972-75 and 1980-87.

EPICORE. Upon closer inspection, however, Epic contends that CONDEC is inconsistent in shape, angle, and size to EPICORE, and, to an expert's eye, contains many noticeable imperfections. Thus, Epic claims that CONDEC's structural performance is significantly inferior to EPICORE, by as much as twenty-five percent.

In this litigation, Epic claims that its purpose was to produce a steel deck product that was unique in the industry, in hopes that EPICORE's distinctive dovetail profile, albeit more expensive to produce, would be easy to identify and synonymous with the Epic company name.[7] Epic contends that, because of the close similarities in the dovetail profiles, a purchaser and user can easily mistake one product for the other, causing confusion in the marketplace. Epic filed suit, claiming trade dress infringement. Based upon a finding of fact that EPICORE's dovetail configuration was primarily non-functional, an element essential to a finding of infringement liability, the magistrate judge awarded Epic damages of $412,131[8] plus costs and permanent injunctive relief. This appeal follows.

## II. ISSUE ON APPEAL

In concluding that Epic prevailed on its claim of trade dress

---

[7]Ironically, in the late 1960's, two other companies were already manufacturing steel decking configured in a dovetail profile, Finestra and H.H. Robertson. By the early 1970's, both companies ceased production. A third company, Elixir, sold dovetail steel decking for five years in the late 1980's. Since this action began, a fourth company, Consolidated Systems Incorporated (CSI), has begun production, and, perhaps, is monitoring this appeal very closely.

[8]The magistrate judge calculated this figure on the basis of Epic's lost profits from 1988 through the date of trial in November 1994.

infringement under § 43(a) of the Lanham Act, did the magistrate judge clearly err in finding that the dovetail configuration of EPICORE's steel decking profile was primarily non-functional?

## III. STANDARD OF REVIEW

The validity of Epic's claim of protectable trade dress under the Lanham Act is a mixed question of law and fact. To determine whether trade dress has been infringed is a question of law subject to *de novo* review. *United States v. Miller,* 71 F.3d 813, 816 (11th Cir.1996). The issue of functionality is a question of fact.*John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 982 (11th Cir.1983). The magistrate judge's conclusion that the EPICORE dovetail profile trade dress is primarily non-functional is subject to a clearly erroneous standard of review. *United States v. Gecas,* 50 F.3d 1549, 1556 (11th Cir.1995).

## IV. DISCUSSION

Section 43(a) of the Lanham Act[9] creates a federal cause of

---

[9]Section 43(a) provides:

> (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall acknowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of the origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation. 15 U.S.C. § 1125(a) (1988).

action for trade dress infringement. *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531 (11th Cir.1986). Trade dress is defined as "the total image of a product ... [that] may include features such as size, shape, color or color combinations, textures, graphics, or even particular sales techniques." *John H. Harland Co.,* 711 F.2d at 980, *citing Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 831 (11th Cir.1982). While the classic trade dress infringement action involved the packaging or labeling of goods, the design of the product itself—its configuration—may constitute protectable trade dress under § 43(a) of the Lanham Act. *Id.* In 1976, the Eighth Circuit established a precedent for the protection of configurations. *Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). *Fruehauf* found the unique exterior design (twin hopper bottomed) of a grain semi-truck trailer body to be protectable trade dress. *See also LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71 (2d Cir.1985). A feature of a product can also be protectable trade dress. C. McKenney & G. Long, *Federal Unfair Competition: Lanham Act § 43(a)* § 5.01 (1994).

In order to prevail on a claim for trade dress infringement under § 43(a), a plaintiff must prove three elements: (1) that the trade dress of the two products is confusingly similar; (2) that the features of the trade dress are primarily non-functional; and (3) that the trade dress is inherently distinctive or has acquired

secondary meaning.[10]  *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.,* 716 F.2d 854, 857 (11th Cir.1983);  *John H. Harland Co.,* 711 F.2d at 980;  *AmBrit,* 812 F.2d at 1535.

Here the magistrate judge found that Epic established[11] all three elements of it claim and concluded that Condec had infringed upon Epic's trade dress.  On appeal, Condec contends that the magistrate judge clearly erred in her conclusion with respect only to the second element, *i.e.,* non-functionality.

A product's features are protectible as trade dress if they are *primarily non-fucntional.  See generally Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 426-30 (5th Cir.1984) (discussing the distinction between features that are functional and those that are

---

[10]Trade dress that is inherently distinctive is protectable under § 43(a) without a showing that it has acquired secondary meaning.  *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

[11]Epic argues that the magistrate judge improperly placed the burden of proof upon it as plaintiff to establish the non-functionality of its trade dress as part of its prima facie case.  Pointing to a split among the circuits, it claims that that burden should have been placed upon the defendant Condec.  [The Third, Ninth, and District of Columbia Circuits place the burden upon the plaintiff. *See American Home Products Corp. v. Barr Laboratories, Inc.,* 834 F.2d 368 (3d Cir.1987), *Sega Enterprises v. Accolade, Inc.,* 977 F.2d 1510 (9th Cir.1992); *Reader's Digest Ass'n. v. Conservative Digest, Inc.,* 821 F.2d 800 (D.C.Cir.1987).  The Second, Seventh, and Tenth Circuits characterize functionality of trade dress as a defense to be pleaded and proved by the defendant. *Compare LeSportsac,* 754 F.2d 71 (2d Cir.1985);  *Computer Care v. Service Systems Enterprises, Inc.,* 982 F.2d 1063 (7th Cir.1992), *Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513 (10th Cir.1987).]  The Eleventh Circuit has not yet decided this issue. *See John H. Harland Co.,* 711 F.2d at 982 n. 26.  We decline to do so now.  The proper placing of the burden of proof becomes important when there is a lack of evidence.  Epic's evidence did not fail to prove non-functionality;  it affirmatively proved functionality.  There is ample, undisputed evidence that requires a finding of functionality.

not). "The line between functionality and non-functionality is not ... brightly drawn in every case." *Fruehauf,* 536 F.2d at 1218. "The issue of functionality has been consistently treated as a question of fact." *John H. Harland Co.,* 711 F.2d at 982, *citing Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769 (9th Cir.1981).

Condec argues that the question of whether Epic's trade dress can be properly characterized as primarily non-functional is the threshold question in any § 43(a) case as, if this question is answered in the negative, the remaining two elements drop away, *cf. In re Morton-Norwich Products, Inc.,* 671 F.2d 1332, 1335 (C.C.P.A.1982), and the trade dress will simply be ineligible for protection. *AmBrit,* 812 F.2d at 1538. Condec does not appeal the magistrate judge's finding that the two other elements were present here. Therefore, under the facts of this particular case, non-functionality is the only issue. However, as all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold.

The only question before us, therefore, is whether the record reflects that the trade dress of EPICORE is primarily non-functional. If, as Condec contends, the dovetail features of Epic's EPICORE product are functional, then Condec was free to copy those dovetail features in the absence of any patent protection. *John H. Harland Co.,* 711 F.2d at 982 *(citations omitted).* If, however, Condec copied dovetail features of Epic's trade dress that are primarily nonfunctional, then Condec is liable for trade dress

infringement under § 43(a).  *Id.*[12]

There is no bright line test for functionality.  *See id.* at 983, *citing Fruehauf,* 536 F.2d at 1218.  The Supreme Court has characterized a functional feature as one that "is essential to the use or purpose of the article or [one that] affects the cost or quality of the article."  *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2186 n. 10, 72 L.Ed.2d 606 (1982).  More recently, the Court stated that "a design is legally functional, and thus unprotectable, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection."  *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 775, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992).[13]

Relying on this authority,[14] the magistrate judge found:

> While the evidence [of non-functionality] is certainly

---

[12]*John H. Harland Co.* involved the trade dress of desk-style checkbooks containing intermediate carry-around stubs, called Memory Stubs.  A panel of this circuit found the Memory Stub product—such as the concept and location of its carry-around stub, the lines for recording information on the stub, and the vertical and horizontal size of the stub—clearly functional.  However, the decorative box around the information lines on the stub and the design and color of the carry-around case were primarily non-functional.  711 F.2d at 983-84.

[13]The Court limited its grant of certiorari in *Two Pesos* only to resolve the conflict among the Courts of Appeals on the question whether trade dress that is inherently distinctive is protectible under § 43(a) without a showing that it has acquired secondary meaning.  505 U.S. at 767-69, 112 S.Ct. at 2757.  It declined to grant certiorari on the question of non-functionality.  *Id.* at n. 6.

[14]We note that, in both cases, the discussion of non-functionality was dicta.  Nevertheless, these tests provide guidance for our analysis.

not as strong as the other two aspects of plaintiff's trade dress claim, this court concludes that plaintiff has shown by a preponderance of the evidence that its Epicore product, with the dovetail profile, is primarily non-functional. This is so because it is very clear that other manufacturers need not incorporate this design into their composite steel deck products to compete effectively.

\* \* \* \* \* \*

... [T]he evidence ... shows that there are numerous alternative composite steel floor deck profiles that compete with the EPICORE profile.

The magistrate judge, however, then went beyond these tests to formulate a market share analysis:

... Epic has a very small market share in the composite steel floor deck industry (about two percent). *If the EPICORE dovetail profile were primarily functional, Epic would logically have a much larger market share.* The fact that no other competitors other than defendants have deemed it necessary to simulate plaintiff's product in order to "compete effectively" demonstrates the non-functionality of the dovetail rib design. (Emphasis added).

We do not agree that market share is the definitive factor in evaluating the functionality of EPICORE's dovetail configuration. A small market share can reflect enormous revenue and profit in dollar terms. While market share may be an indicator of competitiveness, we believe that other factors must be considered in determining whether the dovetail configuration is functional. Therefore, we return to the tests suggested in *Inwood Laboratories* and *Two Pesos* and ask: Is the dovetail configuration essential to EPICORE's use or purpose? Does the dovetail configuration affect EPICORE's cost or quality? Would free competition be hindered if we accord the dovetail configuration protection because there are only a limited number of other options available?

On the functional side, Condec points to Epic's promotional materials that extol the utilitarian benefits of EPICORE's dovetail

profile.  Without the dovetail rib profile, Condec argues, EPICORE would be reduced to nothing more than a hunk of steel.

On the non-functional side, Epic claims that the dovetail ribs merely identify it as a company.  It contends EPICORE is more complex and expensive to produce, hence EPICORE is non-functional. In other words, Epic argues that the dovetail configuration would be functional only if it resulted from a comparatively simple or inexpensive method of manufacture.  Epic also appears to argue that the ribs are merely distinctive arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market, with differently dressed versions of the same product.

The key to this case can be found in the record testimony of the president of Epic, Donald Landis.[15]  Landis testified that the shape of the dovetail rib and its dimensions, especially its depth, plays a critical role in generating the section properties of the composite steel deck into which it is incorporated.[16]  Thereafter, according to Landis, the section properties of the profile of steel deck, moment of inertia and section modulus, respectively, determine how much the product will deflect or sag, and how much stress the product will tolerate.  We can infer from this testimony that EPICORE's geometric shape enhances its section properties, which in turn, enhances the quality or strength of the product.

---

[15]We take judicial notice of the right of every company father to be proud of his product.

[16]Indeed, according to Landis, a difference of as little as 1/16 of an inch in the depth of a dovetail rib would constitute a substantial difference in the quality of the product, as measured by the section properties.

*See Inwood Laboratories,* 456 U.S. at 850 n. 10, 102 S.Ct. at 2186 n. 10. Strength is essential to EPICORE's use or purpose. *Id.*

Epic's own marketing materials indicate that the concept of a dovetail configuration is functional. *See John H. Harland Co.,* 711 F.2d at 983 n. 28 (where Harland's marketing materials indicated that the concept of an intermediate carry-around stub was functional). Reading from his company's brochure, Landis recited[17]:

> Q: Well, this is the one in the upper left-hand side. It says:
>
> "The Epicore composite floor system is number one in composite floor construction."
>
> A: Yes.
>
> Q: Okay. Beneath that, there is another—another line:
>
> "Epicore's unique profile improves performance, lowers initial and life-cycle costs."
>
> Would you please read the following section, please, down to the last bullet point?
>
> A: "Epicore's unique profile improves performance, lowers initial lifecycle costs. An Epicore composite floor slab combines the structural advantages of a flat slab with the time cost-saving advantages of a permanent form. An Epicore

---

[17]The magistrate judge found:

> Defendants point to various aspects of Epic's promotional materials as evidence of the utility of the dovetail rib configuration. These materials include the following statements: "there is no other Composite deck system ... able to match EPICORE's performance", "EPICORE works more efficiently than other decks because it is engineered for trouble-free connector installation, maximum concrete coverage around shear connectors and greater beam spacing." These materials also state that "with EPICORE, composite beams can be lighter in weight, shallower, and spaced further apart, they use less material, reduce building height, and save construction time and costs." Additional advantages are that the profile permits objects to be hung from the deck during construction and a safe working platform is also provided.

slab can support greater loading than a typical reinforced concrete slab of the same depth. Epicore deck furnishes the total positive reinforcement for a composite slab and serves as a permanent form for the concrete. The resulting advantages are many, both during construction and throughout the life of the building. Longer spans, no temporary form work, no positive reinforcing bars, less concrete, less shoring, no spray-applied fire proofing, a permanent integral hanger system that eliminates the layout and insertion of hanging devices before the slabs are poured, and simplifies the planning, installation, and alteration of ceilings, HVAC components, and other suspended equipment. A safe working platform before the concrete is poured when Epicore deck has been properly designed and installed. Runways and planking should be used to protect the deck from damages. Increased present and future flexibility."

* * * * * *

Q: So when your Concept 2 brochure says that there is no other composite deck system similarly designed or able to match Epicore's performance, that's not true?

A: You know, when you say "similarly designed," okay, that's true, okay. There's no other—when I say similarly designed, I'm talking about a dovetail-type shape.

Q: It's a disjunctive. It's says "or able to match Epicore's performance."

Is there anything—there's no other product able to match Epicore's performance?

A: I believe there is. Today I believe there are lots of other products. You know, Epicore is like an automobile. It's like a Cadillac. You can buy a Cadillac; you can buy a Chevrolet. A Chevrolet can go anywhere that the Cadillac can. And why do people buy Cadillacs and why do people buy Chevrolets since there's a big difference in price? They can't go anywhere—you know, any different.

Further the record reflects that H.H. Robertson, in advertising the construction specifications of its (now defunct) Keystone product, extolled the functional virtues of Keystone's dovetail ribs by stating that in order "*[t]o provide a positive keybond with the concrete* the Keystone deck shall have integral pyramidal shaped ribs, all continuous and complete in cross-section, and spaced not more than 6 [inches] on center." In remarkably similar language,

Epic, in its copyrighted brochure, later extolled the same functional virtues of EPICORE by saying "*to provide a positive keybond with the concrete,* EPICORE floor form units shall have continuous dovetail-shaped ribs formed to the following nominal dimensions...." Landis corroborates this with testimony that the dovetail profile was based upon sound engineering principles and that the dovetail rib configuration was one of the keys to Epic's composite steel deck system. In short, it makes it stronger. *See Inwood Laboratories, Inc.,* 456 U.S. at 850 n. 10, 102 S.Ct. at 2186 n. 10.

We cannot conclude that the dovetail ribs are meant primarily for identification purposes—at least three other manufacturers introduced similarly-designed products into the public domain before Epic introduced EPICORE.[18] Neither are they arbitrary arrangements of predominately ornamental features. Like the flaring tendon and mortise by which the corners of drawers are joined in a piece of fine wooden furniture, a strong interlocking joint is formed between EPICORE's dovetail rib and its mortise, the concrete.[19] We conclude that Epic cannot appropriate this functional innovation under the guise of trade dress. *John H. Harland Co.,* 711 F.2d at 983 n. 28.

In sum there is ample evidence to suggest that EPICORE's dovetail profile is primarily functional and not protectable trade dress. We conclude that the magistrate judge's finding is clearly

---

[18]Perhaps this explains why Epic never applied for a patent.

[19]EPICORE uses thirty percent more steel sheeting with which to provide its positive key-bond with the concrete.

erroneous.[20]  To conclude otherwise would hinder Condec in its attempt to compete effectively with Epic, *Two Pesos,* 505 U.S. at 773-75, 112 S.Ct. at 2760, *AmBrit,* 812 F.2d at 1538, and grant Epic a lifetime patent—for which it never applied.

## V. CONCLUSION

Based upon the foregoing, we conclude that Condec did not infringe upon Epic's trade dress in violation of § 43(a) of the Lanham Act.  We reverse Condec's liability as to this claim and remand for further proceedings consistent with this opinion.  As to all other claims, we affirm.

REVERSED and REMANDED in part;  AFFIRMED in part.

---

[20]It is plainly obvious that Condec copied Epic's product. We empathize with the reaction of the magistrate judge to the faithless malfeasance of a defendant who copies his employer's unpatented product while purporting to be its agent.  However, public policy favors competition by all fair means, and that encompasses the right to copy, very broadly interpreted, except where copying is lawfully prevented by a copyright or patent ... and functional shapes are never capable of being monopolized even when they become distinctive of the applicant's goods. *In re Deister Concentrator Co.,* 289 F.2d 496, 503-06 (C.C.P.A. 1961).