[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 11, 2004
THOMAS K. KAHN
CLERK

No. 03-14047

D. C. Docket No. 01-00202 CV-TWT-1

DIPPIN' DOTS, INC.,

Plaintiff-Appellant,

versus

FROSTY BITES DISTRIBUTION, LLC,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Georgia

**(May 11, 2004)**

Before DUBINA and COX, Circuit Judges, and OWENS*, District Judge.

DUBINA, Circuit Judge:

---

*Honorable Wilbur D. Owens, Jr., United States District Judge for the Middle District of
Georgia, sitting by designation.

Plaintiff-Appellant Dippin' Dots, Inc. ("DDI") brought suit against Defendant-Appellee Frosty Bites Distribution, LLC ("FBD") alleging trade dress infringement of DDI's product design and logo design, both in violation of the Lanham Act, 15 U.S.C. § 1125. The district court granted summary judgment in favor of FBD on both claims. For the reasons that follow, we affirm the judgment of the district court.

## I. BACKGROUND

*A.    Facts*

Plaintiff DDI markets and sells a brightly-colored flash-frozen ice cream product, called "dippin' dots," consisting of free flowing small spheres or beads[1] of ice cream. Curtis Jones, DDI's founder, applied for and received Patent No. 5,126,156 ("Patent '156") for the method DDI uses to make dippin' dots. Patent '156 contains six steps: (1) preparing an alimentary ice cream composition for freezing, (2) dripping said composition into a freezing chamber, (3) freezing said composition into beads, (4) storing said beads at a temperature at least as low as -20° F so as to maintain said beads free flowing for an extended period of time, (5) bringing said beads to a temperature between substantially -10° F and -20° F

---

[1] "'Beads' means 'small frozen droplets . . . which have a smooth, spherical (round or ball shaped) appearance." [R. Vol. 108 at 3.]

2

prior to serving, and (6) serving said beads for consumption at a temperature between substantially -10° F and -20° F so that the beads are free flowing when served.[2] DDI is the exclusive licensee of Patent '156.

DDI primarily sells its dippin' dots from colorful kiosks or stands at amusement parks, sporting venues, and shopping malls. To identify itself at these locations, DDI has a distinctive logo made up of an oval of blue, yellow, and pink spheres surrounding the product name, "dippin' dots," in blue letters. Below this oval of spheres is a tag line touting dippin' dots as the "Ice Cream of the Future."

Defendant FBD makes and sells a competing brightly-colored flash-frozen ice cream product, called "frosty bites," consisting of mostly small popcorn-shaped, along with some spherical-shaped, ice cream bites. FBD creates its product by streaming and dripping an ice cream solution into liquid nitrogen where it freezes and forms beads and clusters of frozen ice cream. The frozen product then passes through a "cluster buster," where the clusters are broken down into smaller pieces. The product then moves through a system of conveyor belts, further breaking the ice cream into small beads and popcorn-like clusters.

---

[2] If the flash-frozen ice cream is consumed while too cold, it will burn the mouth of the consumer.

FBD principally sells its frosty bites from booths and kiosks. To identify itself, FBD has a distinctive logo consisting of an ice-like background upon which the words "Frosty Bites" are written in blue letters shadowed in pink. The "o" in the word "Frosty" is the torso of a cartoon caricature of a portly penguin holding a cup of yellow, green, blue, and red nuggets of ice cream. Below the words is a tag line touting frosty bites as "The Ultimate Ice Cream Sensation!".

In the Fall of 1999, several of DDI's retail dealers secretly started the FBD business while still under contract with DDI to sell dippin' dots at various locations.[3] On March 16, 2000, eight of these dealers terminated their contracts with DDI. The following day, without changing locations, they began selling their frosty bites under the "Frosty Bites" logo.

### B. Procedural History

DDI filed suit against FBD alleging infringement of DDI's trade dress (1) in the form of its unique, flash-frozen ice cream product, and (2) in the form of its

---

[3] We assume this allegation to be true because we make all reasonable inferences in favor of DDI, the non-movant, for the purposes of determining whether a grant of summary judgment is appropriate. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

unique logo design, both in violation of the Lanham Act, 15 U.S.C. § 1125.[4] FBD moved for summary judgment.

The district court granted FBD's motion for summary judgment finding that (1) DDI's product design – small, predominantly separated colored beads or pieces of ice cream – is functional and therefore not subject to trade dress protection, and (2) DDI's and FBD's logos are so dissimilar that, as a matter of law, DDI cannot prove any likelihood of consumer confusion as to the source of the products. *In re Dippin' Dots Patent Litig.*, 249 F. Supp. 2d 1346, 1373-74 (N.D. Ga. 2003). DDI timely filed this appeal.

## II. STANDARDS OF REVIEW

This court reviews a grant of summary judgment *de novo*, applying the same legal standards that governed the district court. *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325 (11th Cir. 2001). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[4] DDI also alleged (1) patent infringement, (2) violations of the Uniform Trade Secrets Act ("UTSA"), 18 U.S.C. § 1905, and (3) breach of contract. The district court granted FBD's motions for summary judgment on the patent infringement and UTSA claims. The district court granted DDI's motion for summary judgment on the breach of contract claim, awarding damages in the amount of $1,221.48 for unpaid product properly delivered to FBD. In addition, FBD counterclaimed against DDI for antitrust violations. The district court granted DDI's motion for summary judgment on this counterclaim. None of these claims were appealed.

"[W]e review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir.2001).

### III.  ISSUES

1.     Whether DDI's product design is functional and therefore not subject to trade dress protection.

2.     Whether a reasonable likelihood of confusion exists between DDI's logo and FBD's logo.

### IV.  ANALYSIS

Section 43(a) of the Lanham Act states that

(1) Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, . . . or any false designation of origin, . . . which
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, . . . of such person with another person, . . .
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

### A.  Trade dress infringement of DDI's product design

Section 43(a) creates a federal cause of action for trade dress infringement. *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986).  "The term 'trade dress' refers to the appearance of a product when that appearance is used to identify the producer."  *Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 338 (7th Cir. 1998).  "'Trade [d]ress' involves the total image of a product and may include features such as size, shape, color . . . , texture, graphics, or even particular sales techniques."  *Ambrit*, 812 F.2d at 1535 (internal quotation omitted).  In order to prevail on this claim for trade dress infringement under § 43(a), DDI must prove that (1) the product design of the two products is confusingly similar; (2) the features of the product design are primarily non-functional; and (3) the product design is inherently distinctive or has acquired secondary meaning.  *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996); *see also* 15 U.S.C. § 1125(a)(3) ("[T]he person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."); *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29, 121 S. Ct. 1255, 1259, 149 L. Ed. 2d 164 (2001) (stating that "trade dress protection may not be claimed for product features that are functional").  "[A]s all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold."

7

*Epic Metals*, 99 F.3d at 1039. Because we conclude that DDI has not met its burden of establishing the non-functionality of its product design,[5] we decline to address the other two elements of the claim.

"The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164, 115 S. Ct. 1300,1304, 131 L. Ed. 2d 248 (1995); *see also In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1336 (C.C.P.A. 1982) ("This requirement of 'nonfunctionality' . . . has as its genesis the judicial theory that there exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws."). "Functional features are by definition those likely to be shared by different producers of the same product and therefore are unlikely to identify a particular producer." *Landoll*, 164 F.3d at 340. "[T]hese features cannot be appropriated; otherwise, competitors would be prevented from duplicating the new product even to the extent permitted by the branches of the

---

[5] DDI argues that FBD failed to present any evidence of functionality and therefore DDI should prevail on this issue. DDI's argument is misguided as it improperly shifts the burden of proof to FBD. *See* 15 U.S.C. § 1125(a)(3). This burden does not shift, even at summary judgment. DDI presented insufficient evidence to create a genuine issue of fact as to non-functionality.

law of intellectual property that protect innovation rather than designations of source." *Id.*

"The line between functionality and non-functionality is not . . . brightly drawn." *Epic Metals*, 99 F.3d at 1039 (internal quotations omitted). Nonetheless, two tests exist for determining functionality. *See id.* Under the first test, commonly referred to as the traditional test, "'a product feature is functional . . . if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *TrafFix*, 532 U.S. at 32, 121 S. Ct. at 1261 (quoting *Qualitex*, 514 U.S. at 165, 115 S. Ct. at 1304). Under the second test, which is commonly called the competitive necessity test and generally applied in cases of aesthetic functionality, "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *Id.* (quoting *Qualitex*, 514 U.S. at 165, 115 S. Ct. at 1304). Where the design is functional under the traditional test, "there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id.* at 33, 121 S. Ct. at 1262.

The features of product design that we must analyze in this case are the size, color, and shape of dippin' dots. DDI argues that the district court erred because it did not consider the functionality of DDI's product design *as a whole*, but rather erroneously analyzed each element independently. *See Ambrit*, 812 F.2d at 1538

9

(stating that a court should consider the totality of the trade dress features).[6] DDI

mischaracterizes the district court's analysis. As this court has stated, "[a]lthough

we have described the elements of the [products] that are [dis]similar, we are not

making a comparison of individual elements. Rather, we are explaining why the

overall impression of each [product] is [dis]similar. The district court correctly

followed this same approach." *Id.* at 1541, n.48.

Furthermore, the product design of dippin' dots in its individual elements

and as a whole is functional under the traditional test.[7] The color is functional

because it indicates the flavor of the ice cream, for example, pink signifies

strawberry, white signifies vanilla, brown signifies chocolate, etc. *See, e.g.,*

---

[6] *Ambrit* is distinguishable because it analyzes the packaging of identical ice cream products, to wit "competitively priced, five ounce, stickless, chocolate-covered ice cream bars," rather than the products themselves. *Ambrit*, 812 F.2d at 1541. This distinction does not, however, alter the application of the law as enunciated in *Ambrit*.

[7] Likewise, the color, shape, and size of dippin' dots are "aesthetic functions" that easily satisfy the competitive necessity test because precluding competitors like FBD from copying any of these aspects of dippin' dots would eliminate all competitors in the flash-frozen ice cream market, which would be the ultimate non-reputation-related disadvantage. *See TrafFix*, 532 U.S. at 32-33, 121 S. Ct. at 1261-62. Therefore, DDI's argument that FBD could still compete in the ice cream market by producing, e.g., soft-serve ice cream, which would not have many of the same functional elements as dippin' dots and thus would not infringe upon DDI's product trade dress, is unavailing. FBD does not want to compete in the ice cream business; it wants to compete in the flash-frozen ice cream business, which is in a different market from more traditional forms of ice cream, [R. Vol. 245 at 54]. *See* 3 Louis Altman, *Callmann on Unfair Competition, Trademarks and Monopolies* § 19:7, at 79 (4th ed. 2003) (stating that "functionality . . . is not to be determined within the broad compass of different but interchangeable products; the doctrine of functionality is intended to preserve competition within the narrow bounds of each *individual* product market").

*Qualitex*, 514 U.S. at 163, 115 S. Ct. at 1303 (explaining that "the words 'Suntost Marmalade,' on a jar of orange jam immediately . . . signal a brand or a product 'source'; the jam's orange color does not do so"); *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853, 856, 102 S. Ct. 2182, 2188-89, 72 L. Ed. 2d 606 (1982) (concluding that district court did not err in finding that colors of certain prescription drugs were functional because, *inter alia*, many patients associated color with therapeutic effect); *Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389, 396 (D.N.J. 1989) (finding that in the mouthwash field, an amber colored liquid signifies a medicinal-tasting product, red signifies a cinnamon flavor, blue signifies peppermint, and green signifies mint). The district court took judicial notice of the fact that color indicates flavor of ice cream. DDI argues that such judicial notice was improper. We disagree.

Judicial notice is a means by which adjudicative facts not seriously open to dispute are established as true without the normal requirement of proof by evidence. Fed. R. Evid. 201(a) and (b); *see also* Fed. R. Evid. 201(a) advisory committee's note (explaining that it is proper to take judicial notice of facts with a "high degree of indisputability" that are "outside the area of reasonable controversy"). Adjudicative facts are facts that are relevant to a determination of the claims presented in a case. *Id.*

11

One category of adjudicative facts subject to judicial notice (and the only category relevant in this case) is facts that are "generally known within the territorial jurisdiction of the trial court." Fed. R. Evid. 201(b). Such judicially-noticed facts are of breathtaking variety. *See, e.g., Friend v. Burnham & Morrill Co.*, 55 F.2d 150, 151-52 (1st Cir. 1932) (noting the method for canning baked beans in New England); *Seminole Tribe of Fla. v. Butterworth*, 491 F. Supp. 1015, 1019 (S.D. Fla. 1980), *aff'd*, 658 F.2d 310 (5th Cir. 1981) (noting that bingo is largely a senior citizen pastime); *First Nat'l Bank of South Carolina v. United States*, 413 F. Supp. 1107, 1110 (D.S.C. 1976), *aff'd*, 558 F.2d 721 (4th Cir. 1977) (noting that credit cards play vital role in modern American society); *Carling Brewing Co. v. Philip Morris, Inc.*, 277 F. Supp. 326, 330 (N.D. Ga. 1967) (noting that most establishments that sell beer also sell tobacco products); *Colourpicture Publishers, Inc. v. Mike Roberts Color Prods., Inc.*, 272 F. Supp. 280, 281 (D. Mass. 1967), *vacated on other grounds*, 394 F.2d 431 (1st Cir. 1968) (noting that calendars have long been affixed to walls by means of a punched hole at the top of the calendar).

A court may take judicial notice of appropriate adjudicative facts at any stage in a proceeding, including at the summary judgment stage. *See* Fed. R. Evid. 201(f). While a court has wide discretion to take judicial notice of facts, *see* Fed.

12

R. Evid. 201(c), the "taking of judicial notice of facts is, as a matter of evidence law, a highly limited process." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997). "The reason for this caution is that the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Id.* In order to fulfill these safeguards, a "party is entitled . . . to an opportunity to be heard as to the propriety of taking judicial notice." Fed. R. Evid. 201(e).

In this case, the district court took judicial notice of the fact that color is indicative of flavor in ice cream. This fact is adjudicative in nature and is generally known among consumers.[8] In addition, the district court specifically questioned DDI's counsel regarding the propriety of taking judicial notice of the fact:

> THE COURT: – would you agree that I could take judicial notice that chocolate ice cream is, generally speaking, brown, vanilla is white, strawberry is pink?

---

[8] DDI argued at oral argument that because a color does not necessarily indicate one particular flavor, such fact is not "generally known" and therefore cannot be judicially noticed. DDI's argument is misguided. In order to judicially notice that color is indicative of flavor, it is not necessary that consumers generally know that, for example, pink coloring denotes strawberry ice cream. Rather, it is necessary that consumers generally know that pink coloring denotes some flavor of ice cream, for example, strawberry, bubble gum, or cherry.

13

[COUNSEL]: I think you could do that, I think you could, sir, but I think it would be appropriate to acknowledge that sometimes it's not. Chocolate can be white. I mean, that's not an uncommon occurrence. Certainly with M&M's, chocolate comes sometimes in a blue color.

THE COURT: I'm just talking about ice cream.

[COUNSEL]: Yes, sir.

THE COURT: Ice cream is, generally speaking, chocolate is brown, vanilla is white, and strawberry is pink.

[COUNSEL]: That's correct, sir, but it's not necessarily so.

[R. Vol. 326 at 43.] Therefore, the district court properly took judicial notice of the fact that the color of ice cream is indicative of its flavor. Likewise, we, who also questioned DDI's counsel at oral argument regarding the propriety of taking judicial notice, take judicial notice of the fact that color of ice cream is indicative

of flavor.[9]  Accordingly, we conclude that color is functional in this case because it is essential to the purpose of the product and affects its quality.

Size is also functional in this case because it contributes to the product's creamy taste, which would be different in a larger "dot."  Plaintiff produced materials that emphasized how the quick freezing of tiny round beads was crucial to the taste and consistency of the product because the Patent '156 method of freezing tiny beads reduced the number of ice crystals in the product.  [R. Vol. 249 Ex. C ¶ 4; R. Vol. 168 Ex. 3.]  It necessarily follows that larger pieces of ice cream, which would take longer to freeze, would have increased ice crystals, thus affecting the creamy quality of the finished product.  This is further evidenced by

---

[9] DDI also argues that FBD has unnecessarily copied the "identical Pantone® colors" of its ice cream and such copying infringes upon dippin' dots' unique trade dress. [Appellant's Br. at 20.] While it is true that such exact copying is unnecessary, it does not follow that such copying violates the Lanham Act. *See TrafFix*, 532 U.S. at 32-33, 121 S. Ct. at 1261-62 (stating that the appellate court erred when it applied, as a necessary test, the competitive necessity test because "a feature is also functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device. . . . Functionality having been established, . . . [t]here is no need . . . to engage . . . in speculation about other design possibilities").  As the Seventh Circuit noted in *Landoll*, notwithstanding existing alternatives, the color on the allegedly infringing product was an "aesthetic functionality" and therefore could be freely copied.  *Landoll*, 164 F.3d at 342.  In *Landoll*, the plaintiff argued, much like DDI argues here, that the allegedly infringing cookbooks' pages could have been gilded a color other than gold, which was the color of the plaintiff's cookbooks' gilded pages.  *Id.*  The court stated, however, that, because "[g]old connotes opulence" and is "a natural color to use on a fancy cookbook," a "different color on [plaintiff's] page ends would have a better claim to be a source signifier; compare a blue container of orange juice with an orange one."  *Id.* The same is true of DDI's color choices for its ice cream.  Furthermore, even if the "identical Pantone® colors" were deemed a non-functional element of dippin' dots, the product design *as a whole* is nonetheless functional.  *See Ambrit*, 812 F.2d at 1538 (stating that a court should consider the totality of the trade dress features).

15

DDI founder Jones's Declaration of Commercial Success, submitted to the Patent Office, which emphasized dippin' dots' superior characteristics and benefits that are produced by using the Patent '156 method to create small pieces of ice cream. [R. Vol. 249 Ex. C ¶ 4.] These superior characteristics and benefits include the better taste and texture of dippin' dots, their easy dispensability, and the novel way in which they are consumed. [R. Vol. 249 Ex. C ¶ 4.] In addition, several documents from the Patent '156 application denote the preferable size of the beads in specific millimeter measurements. [R. Vol. 168 Ex. 3.]

Likewise, the shape of dippin' dots is functional because dripping the ice cream composition into the freezing chamber, as described in Patent '156, creates a "bead" that facilitates the product's free flowing nature. [R. Vol. 245 at 160-61.] Jones testified to this, stating he experimented with different procedures in order to create "a uniform bead" [R. Vol. 245 at 150],[10] and that the beaded shape of dippin' dots is a result of the method enunciated in Patent '156 [R. Vol. 245 at

---

[10] Jones also testified that his goal was "to make a kind of rounded product" because he felt it would be more commercially marketable. [R. Vol. 245 at 49.] Notwithstanding Jones's testimony that the shape is aesthetic, it is nonetheless a functional result of the Patent '156 method. [R. Vol. 245 at 158]; *see, e.g., Landoll*, 164 F.3d at 339 ("Mink coats are normally sold dyed. The dye does not make the coat any warmer, but it makes it more beautiful, and . . . it [can]not be claimed as trade dress . . . . Functional improvements may be patentable, or protected as trade secrets, but they cannot be appropriated in the name of trade dress . . . ."). Moreover, in light of the requirement that functionality be determined by analyzing the product as a whole rather than in its individual elements, *see Ambrit*, 812 F.2d at 1538, even if the shape of dippin' dots is not functional alone, the entire trade dress, as a whole, is functional.

158]. Moreover, a DDI product brochure states that the spherical shape is a result of the Patent '156 process and allows the "quick, yet even freeze that is so important to the taste and consistency of the product." [R. Vol. 245 at 207.]

Based on our review of the record and dippin' dots' individual elements, we conclude that the totality of the dippin' dots design is functional because any flash-frozen ice cream product will inherently have many of the same features as dippin' dots. *See Landoll*, 164 F.3d at 342 (stating that when each of the elements is functional, "[i]f the product nevertheless present[s] a distinctive appearance, that appearance would be eligible for legal protection as trade dress *unless it [is] the only way the product [can] look*, consistent with its performing each of the product's functions optimally.") (emphasis added). Therefore, DDI's product design as a whole is essential to its purpose and affects its quality. Accordingly, it is functional under the traditional test, and not subject to trade dress protection.

Lastly, DDI argues that because Patent '156 does not specify color or size,[11] these elements cannot be functional. DDI's argument is unavailing. The Supreme Court held in *TrafFix* that a "utility patent is strong evidence that the features therein claimed are functional." *TrafFix*, 532 U.S. at 29, 121 S. Ct. at 1260. It did not, however, conclude the inverse, i.e. that the absence of such features in the

_____

[11] Patent '156 specifies the product shape as in the form of a "bead."

patent is strong evidence that the features are not functional. Nonetheless, even if this inverse conclusion were the law, the outcome would remain the same in this case because "features are deemed functional until proved otherwise by the party seeking trade dress protection." *Id.* at 30, 121 S. Ct. at 1260. DDI has not met its burden regarding non-functionality.

After a careful review of the record, we conclude that DDI's product design is functional as a whole and in its individual elements. To hold otherwise runs counter to intellectual property law because it would give DDI "a monopoly more effective than that of the unobtainable patent." *See Morton-Norwich*, 671 F.2d at 1337. "It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time." *Qualitex*, 514 U.S. at 164, 121 S. Ct. at 1304. Therefore, DDI's product design is not subject to trade dress protection. Accordingly, summary judgment in favor of FBD was proper.

B.      *Trade dress infringement of DDI's logo*

"The touchstone test for a violation of § 43(a) is the likelihood of confusion resulting from the defendant's adoption of a trade dress similar to the plaintiff's." *Ambrit*, 812 F.2d at 1538 (internal quotations omitted).

In determining whether a likelihood of confusion exists, the fact finder evaluates a number of elements including [the following seven factors]: the strength of the trade dress, the similarity of design, the similarity of the product, the similarity of retail outlets and purchasers, the similarity of advertising media used, the defendant's intent, and actual confusion. The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision. The appropriate weight to be given to each of these factors varies with the circumstances of the case.

*Id.* (internal citations omitted).

DDI argues that the district court erred because it considered only the similarity of the designs rather than all seven factors. We agree. The "extent to which two marks are confusingly similar cannot be assessed without considering all seven factors to ensure that the determination is made in light of the totality of the circumstances." *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488-89 (11th Cir. 1987) (holding that the court committed reversible error when it "focused solely on the degree of visual similarity between the two marks").

However, a "district court's failure to consider all the factors relevant to the issue of whether two marks are confusingly similar does not necessarily constitute reversible error." *Id.* at 1489. Due to the applicable *de novo* standard of review in

19

this case, this court may analyze the remaining six factors. After reviewing the record in the light most favorable to DDI, as the non-movant, we conclude that the remaining six factors all weigh in favor of DDI.[12] Nonetheless, we conclude that no reasonable jury could find that the two logos are confusingly similar because the lack of visual similarity between the two designs is overwhelming.[13] *See Ambrit*, 812 F.2d at 1538 (stating that "a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision"). Therefore, summary judgment in favor of FBD was proper.

---

[12] Viewing the facts and inferences in the light most favorable to DDI, we conclude that (1) DDI's logo is strong; (2) the two logos are overwhelmingly dissimilar; (3) the two products are very similar; (4) the retail outlets and purchasers are identical; (5) insufficient evidence eixts to evaluate the similarity of the advertising media; (6) FBD *arguably* intended to confuse consumers; and (7) actual confusion *arguably* exists, though evidence presented by DDI does not clearly infer actual confusion. Accordingly, the second factor weighs in favor of FBD while the remaining six factors weigh in favor of DDI.

[13] FBD suggests that we adopt the application of the multi-factor test articulated by the Third Circuit in *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 214 (3d Cir. 2000), wherein a court, when presented with logos of directly competing goods, may consider only the similarity of the marks, and need not address the remaining factors, if it so chooses. *See also Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) ("Where the two marks are entirely dissimilar, there is no likelihood of confusion. . . . Nothing further need be said."). Because we are bound by our prior panel precedent, we cannot adopt this modification of the test. *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court."). Moreover, we conclude that such modified application is unnecessary because our present seven-factor balancing test allows us to reach the same conclusion when the logos of directly competing goods are overwhelmingly dissimilar.

DDI further argues that the district court erred because it evaluated the logos too closely. DDI relies on *Ambrit* to support its argument that the district court should have considered in its analysis of the logos "the actual sales environment with the typical consumers" [Appellant's Br. at 3], to wit, 8-18 year old impulse ice cream buyers. Because these "typical consumers" do not closely evaluate the logos when they make their impulse purchases, the district court, according to DDI, erred when it evaluated the logos closely.

> This court stated in *Ambrit* that
>
> a court may not view trade dress in a vacuum. Rather, a court must consider how the trade dress would function in the actual market place. Ice cream novelties are impulse items . . . sold . . . to hurried shoppers. When viewed in this context, the *general similarity of the design of the trade dress of the two products* is a[] . . . strong[] indication of the existence of likelihood of confusion.

*Ambrit*, 812 F.2d at1541 (involving competing trade dress packages that were both 3 x 3 inch panels of silver, white, and blue, depicting a polar bear on all fours, with block lettering, and sold in the same locations) (emphasis added). In the logos at issue here, however, there is no "general similarity." DDI repeatedly refers to the "subtle visual differences" in the two logos. [Appellant's Br. at 10.] The differences, however, are anything but "subtle." In fact, the two logos are overwhelmingly dissimilar, even upon a quick and cursory viewing in the impulse

21

buying market. Notwithstanding that both logos are "colorful [and] fanciful" [Appellant's Br. at 12], the two logos are so different that no reasonable jury could find that even a hurried 8-18 year old impulse shopper could confuse them. Accordingly, summary judgment in favor of FBD was proper.

## V. <u>CONCLUSION</u>

FBD's usurpation of DDI's business may have been immoral or unethical, but in the absence of a non-compete clause in the applicable contracts, it was not illegal. *See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157, 109 S. Ct. 971, 981, 103 L. Ed. 2d 118 (1989) ("The law of unfair competition has [as] its . . . focus . . . the protection of consumers [from confusion as to source], not the protection of producers as an incentive to protect innovation."); *Epic Metals*, 99 F.3d at 1042 n.20 (finding no trade dress infringement notwithstanding that defendant copied plaintiff's product through "faithless malfeasance . . . while purporting to be its agent" because "public policy favors competition by all fair means, and that encompasses the right to copy, . . . except where copying is lawfully prevented by a copyright or patent."); *see also Landoll*, 164 F.3d at 343 ("[T]rademark and trade dress law do not protect originality; they protect signifiers of source."). DDI wants to preclude FBD from competing in the flash-frozen ice cream market, but it cannot do so by claiming

22

trade dress infringement on its functional product design and overwhelmingly dissimilar logos.   For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of FBD.

**AFFIRMED.**