**GENERAL MOTORS CORPORATION,**
a Delaware Corporation, Plaintiff,

v.

**LET'S MAKE A DEAL, an entity of unknown origin, and Richard Castellanos, an individual, Defendants.**

No. CV–N–02–0384–DWH(VPC).

United States District Court,
D. Nevada.

Aug. 29, 2002.

**1188**

Jeremy Nork, Reno, NV, Gregory D. Phillips, Howard Phillips & Anderson, Salt Lake City, UT, Scott R. Ryther, Howard Phillips & Anderson, Salt Lake City, UT, Charles H. Ellerbrock, General Motors, Detroit, MI, for Plaintiff.

Kent Hanson, Reno, NV, for Defendant.

### ORDER

HAGEN, District Judge.

Before the court is plaintiff's motion for preliminary injunction (# 3), defendants' opposition (# 's 17/18), and plaintiff's reply (# 19). Also before the court is its order (# 22) requiring plaintiff to show cause why defendants were properly notified of the preliminary injunction proceedings. For the reasons set out below, the court finds that defendants were properly notified of the proceedings and that plaintiff is entitled to injunctive relief.

### I. *Factual Background*

Plaintiff, a Delaware corporation, is an automobile manufacturer, and it and its predecessors have developed and sold the Hummer vehicles since 1981. Hummer vehicles are a type of sports utility vehicle that gained popularity through its use as a military vehicle during the Gulf War. (Compl.(# 2) ¶¶ 2, 7–8.)

Since 1999, plaintiff has owned all rights to the trademarks and trade dress of the vehicles as well as the goodwill. In that regard, plaintiff owns registered trademarks for HUMMER and the HUMMER GRILL (comprising the nose and grill of vehicle). Plaintiff also has applications pending in the United States Patent and Trademark Office for the symbols H1 and H2. Plaintiff also claims trade dress in the exterior design and shape of the Hummer vehicles. (*Id.* ¶¶ 7–13 & Exs. A & B.) Plaintiff collectively refers to all of these components as "Hummer Marks." (Pl.'s Mot. (# 3), at 4.)

Plaintiff alleges they have spent hundreds of millions of dollars developing these unique characteristics as well as marketing the Hummer vehicles throughout the world, and that as a result of these efforts, the Hummer marks are widely known and recognized throughout the world as symbols of high quality and unique vehicles. (Compl.(# 2) ¶¶ 11–15.)

Defendants operate "Let Make a Deal," a used car lot, in Reno, Nevada. According to plaintiff, defendants have been producing "car kits" that capture all the unique characteristics of the Hummer vehicles, and have been advertising them on their website, *www.hmmmv.com.* (Compl.(# 2) ¶¶ 17–26.)

Plaintiff alleges that these actions give rise to claims for trademark and trade dress dilution, 15 U.S.C. § 1125(c); federal trademark infringement and counterfeiting, 15 U.S.C. § 1114(1); false designation of origin or sponsorship, false advertising, and trade dress infringement, 15 U.S.C. § 1125(a); and common law trademark infringement. (*See generally Id.*) Plaintiff is seeking injunctive relief as well as damages against defendants. Before the court

is plaintiff's request for preliminary relief under the Lanham Act.

## II. *Analysis*

### A. Rule 65(a)'s Notice Requirement

In its order regarding plaintiff's motion for preliminary injunction, the court ordered plaintiff to serve defendants with all documents on file along with a copy of the order no later than July 23, 2002. The order further specified that defendants were to file their opposition by August 5, 2002, and plaintiff's reply was due August 14, 2002. (*See* Order (# 6).)

On August 13, 2001, plaintiff filed a notice asserting that defendants were properly served and had failed to oppose the preliminary injunction motion. (*See* Notice (# 10).) Defendants filed a response arguing that plaintiff failed to serve them in accordance with Fed.R.Civ.P. 4 and this court's order. (Def.'s Resp. & Opp'n (#'s 17/18), at 3–4.) In response to this challenge by defendants, the court ordered plaintiff to file a memorandum demonstrating that defendants were properly served. (*See* Mins. of Ct. (# 21).) It appears that defendants were adequately notified of the proceedings.

Pursuant to Fed.R.Civ.P. 65(a)(1), "[n]o preliminary injunction shall be issued without notice to the adverse party." However, neither the rule nor the advisory comments define adequate notice. While the Ninth Circuit has not addressed this issue in a published opinion, other circuits have developed two approaches for evaluating the sufficiency of notice.

In the majority of circuits, determinations of whether a party was given sufficient notice are within the trial court's discretion. *See, e.g., Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir.2001); *Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir.2000); *Anderson v. Davila*, 125 F.3d 148, 156–57 (3d Cir.1997); *Levi Strauss &*

*Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 986 (11th Cir.1995); *Illinois ex rel. Hartigan v. Peters*, 871 F.2d 1336, 1340 (7th Cir.1989). Under this approach, a determination of adequate notice is to be guided by the purpose of Rule 65(a)'s notice requirement: "The notice required by Rule 65(a) before a preliminary injunction can issue implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 433 n. 7, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). Priors court have determined that one to three days notice is adequate time to prepare a defense. *See, e.g., United States v. Alabama*, 791 F.2d 1450, 1458 (11th Cir.1986).

In the alternative, the Fifth Circuit requires that notice be given in accordance with Fed.R.Civ.P. 6(d). *Parker v. Ryan*, 960 F.2d 543, 544 (5th Cir.1992). Rule 6(d) requires that, with any written motion that can not be heard ex parte, the motion and notice of the hearing be served at least five days before the hearing date. However, compliance with this rule is not necessary if the facts are not in dispute or the adverse party has actual notice of the proceeding. In this situation, the notice must simply alert the party to the hearing and provide the party an adequate amount of time to prepare a defense. *Parker*, 960 F.2d at 545.

It appears here that defendants were given adequate notice under both standards. First, in their memorandum, plaintiff provided affidavits demonstrating that their process servers made multiple attempts to serve both Castellanos and Let's Make a Deal, and that they delivered all materials required by the order to Let's Make a Deal's business premises on July 23, 2002. (Pl.'s Mem. Re: Service (# 23), Exs. A–E.) While defendants contend that

plaintiff served a "seventeen year old girl who was waiting for her mother to pick her up," defendants do not state that they did not receive notice through this service. Additionally, it appears that defendants received actual notice through this because defendants do not deny that a Gary, who held himself out as defendant Castellanos' son and as in charge of Let's Make a Deal, contacted plaintiff's counsel on July 23, 2002 to discuss the lawsuit and upcoming deadlines. (*See* Def.'s Resp. & Opp'n (# 's 17–18), at 3–4.) Moreover, defendants filed an opposition to the preliminary injunction motion and appeared at the hearing. Accordingly, it appears that defendants were adequately notified within the meaning of Rule 65(a) and in compliance with this court's previous order.

## B. Ninth Circuit Preliminary Injunction Standard

A preliminary injunction is "an extraordinary remedy, which should be granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989) (quoting *Frank's GMC Truck Center, Inc. v. G.M.C.*, 847 F.2d 100, 102 (3d Cir.1988)). This remedy should only be granted where the merits of the case clearly favor one party over the other. *See Remlinger v. Nevada*, 896 F.Supp. 1012, 1015 (D.Nev.1995). As the *Remlinger* court explained

> The cases best suited to preliminary relief are those in which the important facts are undisputed, and the parties simply disagree about what the legal consequences are of those facts. The court in such a case can take the undisputed facts, apply the law to them, and fairly easily decide which party is likely to prevail.

*Id.*

A party seeking a preliminary injunction must fulfill one of two standards, described in the Ninth Circuit as "traditional" and "alternative." *See Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir. 1987). Under the traditional standard, a court may issue preliminary relief if it finds that (1) the moving party will probably prevail on the merits; (2) the moving party will suffer irreparable injury if the relief is denied; (3) the balance of the hardships favor the moving party; and (4) the public interest favors granting relief. *Id.*

Under the alternative standard, the moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions exist and the balance of hardships tips sharply in its favor. *See id.* This latter formulation represents two points on the sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *See Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985).

In evaluating plaintiff's Lanham Act claims, it appears plaintiff is likely to succeed on the merits of these claims, and accordingly is entitled to preliminary relief.

## C. Application of Standard

### 1. Likelihood of Success on the Merits

#### a. Trademark & Trade Dress Dilution, 15 U.S.C. § 1125(c)

Section 1125(c) of the Lanham Act provides for injunctive remedies for the dilution of trademarks. To establish a violation, the plaintiff must demonstrate:

> "(1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the defendant's use began after the mark became fa-

mous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services."

*Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1324 (9th Cir.1998). *See also Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 873–74 (9th Cir.1999). Plaintiff contends that defendants' use of its marks, consisting of the trademarks for HUMMER, the HUMMER GRILL, H1, H2, and the trade dress of the HUMMER H1 and H2 vehicles, is diluting them. Defendants do not address plaintiff's dilution claim. A quick study of the above elements indicates that plaintiff is likely to prevail on this claim.

### i. Famous

■■ To satisfy the famousness requirement of the dilution statute, " 'a mark [must] be truly prominent and renowned.' " *Avery Dennison,* 189 F.3d at 875 (quoting *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 46 (1st Cir.1998)). In making this determination, a court is guided by the following factors as well as any other relevant considerations:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

11 U.S.C. § 1125(c).

Plaintiff contends that their marks and trade dress are famous because they are "among the most famous and world-renowned marks on the planet" and are symbols of high quality automobiles and related services and are associated exclusively with GM. (Pl.'s Mot. (# 3), at 12.) In that regard, plaintiff alleges they have spent hundreds of millions of dollars since 1981 in the global marketing of the components of their marks and trade dress. They also contend they prominently display the marks in their advertising, that GM and its authorized dealers are the only parties authorized to sell the vehicles and related products and services.

Upon consideration of the above factors, it appears the marks are famous. Significantly, they are marketed worldwide, they are for a specific kind of vehicle, and in looking at the marketing materials submitted, it appears that much effort has been made to prominently display the marks in a manner that will cause the public to associate the marks with GM. (Pl.'s Mot. (# 3), at 4; Def.'s Resp. & Opp'n (# 's 17–18), Ex. C (marketing materials for H2).) Additionally, plaintiff and its predecessors have been using these marks and trade dress since 1981. (Pl.'s Mot. (# 3), at 2.)

### ii. Commercial Use

■■ The second element requires that the defendant's use amounts to a "commercial use in commerce." That is, the "use of a famous and distinctive mark to sell goods other than those produced or authorized by the mark's owner." *Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894,

903 (9th Cir.2002). This requirement appears easily satisfied since it seems the defendants sold car kits to consumers that bear the Hummer marks. (*See* Compl. (# 2), Ex. C) (showing models of the car kits plaintiff sold.)

### iii. Mark was Famous Prior to Other Person's Use

Likewise, it appears this element is easily established since plaintiff and its predecessors have been using the marks since 1981 in the marketing of the vehicles. (*See* Pl.'s Mot. (# 3), at 2.) Defendants do not contend that they used them prior to plaintiff.

### iv. Use Causes Dilution

■ Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. *See also Panavision Int'l, L.P.*, 141 F.3d at 1324–26. Dilution can be demonstrated through the traditional means of blurring or tarnishment or based upon other showings by the mark's owner. Blurring occurs where a party uses another's mark to identify their goods or services, and gives rise to the concern that the mark will no longer serve as a unique identifier of the plaintiff's product. Tarnishment "occurs when a famous mark

is improperly associated with an inferior or offensive product." *Id.* at 1326 n. 7.

Plaintiff appears to satisfy this element. Plaintiff states that defendants' use of plaintiff's marks to market their own products whittles away at their distinctiveness. (Pl.'s Mot. (# 3), at 11–13.) Plaintiff appears correct in light of the similarities between the two vehicles and the symbols marking them. It appears they could cause consumers to associate plaintiff's marks with defendants' products. Moreover, given that plaintiff's significant marketing efforts have succeeded in strengthening their marks, it appears that defendants' use of similar marks will blur the public's identification of them and diminish their ability to serve as a unique identifier of plaintiff's vehicles. *See Liquid Glass Enterprises, Inc. v. Dr. Ing. h.c.F. Porsche AG*, 8 F.Supp.2d 398, 405 (D.N.J.1998).

### b. Trademark Infringement, 15 U.S.C. 1114(1) & False Designation of Origin or Sponsorship, 15 U.S.C. § 1125(a)

■ In its second and third claims, plaintiff alleges trademark infringement and false origin based upon defendants' use of their registered marks. These two provisions of the Lanham Act operate together to provide protections against the copying of registered and unregistered marks.[1] The analysis under both statutes

---

1. Under trademark infringement, the plaintiff must demonstrate that defendants have used, without plaintiff's permission, "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark [owned by plaintiff] in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1).

Similarly, a claim of false designation of origin or sponsorship requires plaintiff to demonstrate that defendants:

(1) use in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1).

is almost identical. *Brookfield Communications, Inc. v. West Coast Entm't,* 174 F.3d 1036, 1046 n. 8 (9th Cir.1999). Accordingly, they will be evaluated together. To demonstrate a violation under either provision, the plaintiff must point to a protectable interest in the mark and the likelihood of confusion. *Id.*

### i. Existence of Valid Protectable Trademark

It appears that plaintiff owns a valid protectable trademark interest since plaintiff registered the marks with the Principal Register in the Patent and Trademark Office. *See* 15 U.S.C. §§ 1057(b); 1115(a) (specifying that such registration constitutes prima facie evidence of the validity of the registered mark and plaintiff's exclusive right to use the mark specified in the registration). Plaintiff has provided the certificates of registration for the symbol HUMMER, the Hummer Grill (comprising the vehicle's nose and grill), and verification of the pending applications for registration of the trademarks for H1 (used with original model) and H2 (relating to a newest version of the vehicle). (*See* Compl. (# 2) Exs. A & B.) Defendants do not rebut this presumption in their opposition. (Def.'s Resp. & Opp'n (# 's 17/18), at 4–5.)

### ii. Likelihood of Confusion

■■■ The predominant concern is the likelihood of confusion between the competing products. The inquiry in this regard asks "whether the similarity of the marks is likely to confuse customers about the source of the products." *Brookfield Communications, Inc.,* 174 F.3d at 1053. The following factors are considered in determining whether a likelihood of confusion exists between related goods: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979). The importance of these factors varies with each case, and this list is not exhaustive. However, the significance of the presence or absence of some of these factors remains a constant. For instance, "[t]he use of similar marks to offer similar products accordingly weighs heavily in favor of likelihood of confusion." *Brookfield Communications, Inc.,* 174 F.3d at 1056. Similarly a showing of intent on the part of defendant to copy is entitled to "great weight." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 845–846 (9th Cir.1987).

■■■ Plaintiff maintains that confusion exists because their marks are strong, defendants' products compete with plaintiff's, the parties' marks are similar, and defendants knowingly infringed upon plaintiff's marks. Defendants counter that there is no likelihood of confusion because the parties' grills and noses are not identical but only similar, that there is no evidence available to infer defendants intended to copy from plaintiff, and that the use of H-KIT is distinguishable from plaintiff's H1 and H2 symbols. (Def.'s Resp. & Opp'n (# 's 17/18), at 7, 11–12.)

A brief evaluation of the *Sleekcraft* factors shows this prong also tips in plaintiff's favor. First, given that the parties sell almost identical products, the vehicles appear to be related goods since they " 'would be reasonably thought by the buying public to come from the same source if sold under the same mark.' " *AMF Inc.,* 599 F.2d at 348 n. 10 (quoting *Standard Brands, Inc. v. Smidler,* 151 F.2d 34, 37 (2d Cir.1945)).

■■■ Moreover, the marks used by both parties are very similar. Evaluation of the similarity of marks requires consideration

of the marks' sights, sounds, and meanings. *Id.* at 351. With regard to the nose and grill, even defendants concede that there is "much similarity" in appearance between their kit's nose and grill and plaintiff's. (Def.'s Resp. & Opp'n (#'s 17/18), at 7.) In comparing plaintiff's vehicle with defendants' kit, the court finds that the nose and grill are close to identical. (*See* Compl. (# 2), at 4, 6 (pictures of the plaintiff's Hummer and defendants' kit).) Additionally, the defendants use of "H–KIT" is very similar to plaintiff's H1 and H2 such that it also supports a finding of confusion.

 Since plaintiff's marks appear to be very strong and deserving of the greatest protections under trademark law, this also tips in favor of finding confusion. Trademarks may be sorted into five categories of increased strength and distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc., v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Fanciful marks, the strongest type, are "wholly made-up terms," such as "Clorox" bleach. *Brookfield Communications, Inc.,* 174 F.3d at 1058 n. 19. As the Ninth Circuit recently explained, "[t]he stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Id.* at 1058. Plaintiff contends that their marks are "'fanciful' symbols that have been associated exclusively with GM and the reputation of the HUMMER® vehicles as extremely famous SUV's and off-road vehicles." Defendants do not oppose plaintiff's arguments. In considering the extent of plaintiff's advertising, the uniqueness of the name and symbols, plaintiff's marks appear to be fanciful.

 Another factor addresses the infringer's intent in adopting the marks. In this regard, "[t]his factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Id.* at 1059. There are two pieces of evidence that the court finds telling of defendants' intent to copy plaintiff's marks: (1) on their web-site they advertise their kits as "look-a-likes"; and (2) they refer to their kits as "H–KITS." [2] Both of these demonstrate that defendants desired to link their product to plaintiff's in order to attract buyers. As such, this consideration supports plaintiff.

 However, one factor does appear to tip in defendants' favor: type of goods and degree of care likely to be exercised by purchasers. As a rule of thumb, consumers are expected to be more discerning and less easily confused when the products in question are expensive items. *Id.* at 1060. The plaintiff's vehicles and defendants' kits are big ticket items. Defendants' kits sell for over $10,000, and plaintiff's are considerably more. Accordingly, it is likely that consumers will be able to discern that they are dealing with two separate products marketed by separate parties.

The remaining three factors, evidence of actual confusion, marketing channels used, and likelihood of expansion, have not been briefed by the parties and a quick study of them indicates that they are minor considerations and do not appear to tip heavily in favor of either side. In sum, there appears to be a danger of likelihood of confusion since it appears that plaintiff's marks

---

**2.** The court was not persuaded by defendants' assertion that it randomly selected "H" out of all the letters of the alphabet.

are fanciful, that the parties' marks are almost identical, that the goods are related, and that defendants intended to copy plaintiff's marks.

### c. Trade Dress Infringement, 15 U.S.C. § 1125(a)

■ Plaintiff also claims that defendants' actions constitute trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). (Compl.(# 2) ¶¶ 42–47.) Trade dress is defined as "the 'total image of a product' and may include features such as size, shape, color, color combinations, texture or graphics." *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993) (quoting *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989)). Plaintiff alleges a trade dress in the "inherently distinctive" shape of their vehicles, and in the alternative that the vehicles' shape has acquired secondary meaning.

According to plaintiff, defendants have incorporated plaintiff's trade dress into the features of their car kits. A party's adoption of a trade dress confusingly similar to another's may be actionable under § 43(a). A three part test has evolved for evaluating whether a trade dress is protected under this statute: (1) whether the trade dress is inherently distinctive or has acquired distinctiveness through secondary meaning; (2) whether the trade dress is not functional; and (3) whether there is any likelihood of confusion between a party's trade dress and an alleged infringer's. *Two Pesos, Inc.*, 505 U.S. at 768–769, 112 S.Ct. 2753.

### i. Distinctiveness of Plaintiff's Trade Dress

■ With regard to its trade dress claim, plaintiff claims a trade dress in the body shape and appearance of the vehicles and claims it is "inherently distinctive," or in the alternative, has acquired secondary

meaning. Defendants do not challenge this contention in their opposition.

■ Trade dress is protected if it is inherently distinctive or has acquired secondary meaning. *Id.* at 768–69, 112 S.Ct. 2753. However, if trade dress is claimed in a product design, it will only be protected upon a showing of secondary meaning because product design can never be inherently distinctive. *Wal–Mart Stores, Inc. v. Samara Bros. Inc.*, 529 U.S. 205, 216, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). A trade dress is said to have secondary meaning if the purchasing public associates it with a specific producer or source rather than with merely the product. Factors to consider include the following: (1) whether actual purchasers associate plaintiff's trade dress with its products; (2) the degree and manner of plaintiff's use of the trade dress; and (3) whether plaintiff's use of the trade dress has been exclusive. *Vision Sports, Inc.*, 888 F.2d at 615. Proof that a party has copied another's trade dress "strongly supports an inference of secondary meaning." *Id.* Evidence of a manufacturer's sales, as well as advertising and promotional activities are also relevant. However, the critical inquiry is the effectiveness of these efforts to create secondary meaning. *International Jensen, Inc.*, 4 F.3d at 824.

Since plaintiff is alleging trade dress in the exterior design of its vehicles, plaintiff must demonstrate secondary meaning. In applying the above factors, it appears that plaintiff's trade dress has secondary meaning. Plaintiff uses its trade dress in its advertising and marketing of its vehicles. It claims to have spent hundreds of millions of dollars in these marketing efforts. Moreover, the unique shape of the plaintiff's Hummer, and the lack of comparable vehicles on the market, would seem to

conjure up an association with plaintiff as well.

### ii. Functionality

Since this is also an action for trade dress infringement, plaintiff must also meet the second requirement of § 43(a): the trade dress must be non-functional.[3] A product feature is functional if it is essential to the use or purpose of the item or affects its cost or quality. *Lisa Frank, Inc. v. Impact Intern., Inc.,* 799 F.Supp. 980, 987 (D.Ariz.1992). Functional features include those aspects of a product that make it easier for consumers or are cheaper to manufacture. *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381–1382 (9th Cir.1987). In contrast, non-functional features are those that are arbitrarily affixed or included for aesthetic purposes. In addition, the existence of alternative designs supports a finding of non-functionality. *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1260 (9th Cir.2001). A trade dress is examined as a whole when determining functionality. Thus, features, when considered separately as functional, may still create a non-functional trade dress when considered together. *First Brands Corp.,* 809 F.2d at 1381–1382. *See also Clicks Billiards, Inc.,* 251 F.3d at 1259 (explaining that a product should be evaluated as a whole on its functionality because "[t]rade dress is the composite tapestry of visual effects.").

Defendants contend that plaintiff's trade dress is functional, as evidenced by plaintiff's marketing materials, and therefore not deserving of protection. (Def.'s Resp. & Opp'n (# 's 17/18), at 10.) Plaintiff maintains the trade dress of its vehicles is not functional when considering all the options defendants had in designing their kit and based upon prior cases of infringement involving car kits. (Pl.'s Reply (# 19), at 5–7.)

It appears that the sum of the elements of the Hummer trade dress are non-functional. While defendants are correct that plaintiff incorporated design features that do serve some functional purposes, the overall finished product has attained non-functional status. Plaintiff in selecting and incorporating various components into its vehicle has created a sports utility vehicle that is aesthetically different from all vehicles on the market. The sum of its components, while they serve functional purposes, nevertheless create a unique looking vehicle. The overall appearance of plaintiff's vehicle distinguishes it from competitor's sports utility vehicles. Moreover, there are ample alternative designs available to defendants as evidenced by the current size of the sports utility vehicle market.

### iii. Likelihood of Confusion

As with trademark infringement and false origin claims, a plaintiff must also demonstrate a likelihood of confusion as to its trade dress using the *Sleekcraft* factors. Because these factors touch upon general considerations such as defendants' intent and the strength, similarity and proximity of the goods, for reasons similar to those highlighted above, it appears a likelihood of confusion as to plaintiff's trade dress exists as well.[4]

### 2. Irreparable Harm Presumed

If a plaintiff has demonstrated a likelihood of prevailing on the merits of their trademark infringement or unfair

---

**3.** Since the trade dress at issue is unregistered, plaintiff, as the party asserting the trade dress protection, carries the burden of demonstrating the trade dress is not functional. 15 U.S.C. § 1125(a).

**4.** For a discussion of those factors, *see supra* at 1193–95.

competition claims, irreparable harm may be presumed. *Vision Sports, Inc.*, 888 F.2d at 612 n. 3. *See also Brookfield Communications, Inc.*, 174 F.3d at 1066. In light of the seemingly strong showing by plaintiff, irreparable harm can appropriately be presumed.

The court notes that defendants' argument that it has taken down its website, thus eliminating the harm to plaintiff, is unavailing since there are still other means for defendants to sell their kits. Accordingly, this does not deny plaintiff of the presumption of irreparable harm.

### III. *Conclusion*

Accordingly, **IT IS ORDERED** that plaintiff's motion (# 3) be **GRANTED.**

**IT IS FURTHER ORDERED** that pursuant to Rule 65 of the Federal Rules of Civil Procedure, Defendants and all of their officers, directors, agents, servants, employees, attorneys, and all other persons in active concert or participation with Defendants who receive actual notice of this Order, are preliminarily enjoined and restrained from:

1. Manufacturing, advertising, marketing, and/or selling car kits that use, copy, misappropriate, or are confusingly similar to the trade dress (or shape) of HUMMER® vehicles, the HUMMER GRILL®, and/or the trademarks H1™ and H2™;

2. Copying, using, and/or misappropriating the HUMMER GRILL® in any manner;

3. Otherwise violating GM's trademark and trade dress rights;

4. Instructing, assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraphs 1 through 3 above.

**IT IS FURTHER ORDERED** that plaintiff shall give security in the amount of $100,000, for the payment of such costs

and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.