**BENTLEY MOTORS LIMITED CORPORATION and Bentley Motor, Inc., Plaintiffs,**

v.

**Matthew McENTEGART, Fugazzi Cars, Inc., Robert Fraray III, and Keeping It Real Auto Customizing, Defendants.**

Case No. 8:12–cv–1582–T–33TBM.

United States District Court,
M.D. Florida,
Tampa Division.

Oct. 9, 2012.

Armando Pedro Rubio, Cole, Scott & Kissane, PA, Miami, FL, Gregory D. Phillips, Howard, Phillips & Andersen, PC, Jason P. Eves, Scott R. Ryther, Phillips Ryther & Winchester, LLC, Salt Lake City, UT, for Plaintiffs.

Matthew McEntegart, St. Petersburg, FL, pro se.

John F. McGuire, McGuire Law Offices, PA, Clearwater, FL, for Defendants.

## ORDER

VIRGINIA M. HERNANDEZ COVINGTON, District Judge.

This cause comes before the Court pursuant to the September 19, 2012, report and recommendation of Thomas B. McCoun, United States Magistrate Judge (Doc. # 43), in which Judge McCoun recommends that Plaintiffs' Motion for Preliminary Injunction (Doc. # 5) be granted.

As of this date, there are no objections to the report and recommendation, and the time for the parties to file such objections has elapsed.

 After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject or modify the magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1); *Williams v. Wainwright,* 681 F.2d 732 (11th Cir.1982), *cert. denied,* 459 U.S. 1112, 103 S.Ct. 744, 74 L.Ed.2d 964 (1983). In the absence of specific objections, there is no requirement that a district judge review factual findings *de novo, Garvey v. Vaughn,* 993 F.2d 776, 779 n. 9 (11th Cir.1993), and the court may accept, reject or modify, in whole or in part, the findings and recommendations. 28 U.S.C. § 636(b)(1)(C). The district judge reviews legal conclusions *de novo,* even in the absence of an objection. *See Cooper–Houston v. S. Ry. Co.,* 37 F.3d 603, 604 (11th Cir.1994); *Castro Bobadilla v. Reno,* 826 F.Supp. 1428, 1431–32 (S.D.Fla.1993), *aff'd,* 28 F.3d 116 (11th Cir.1994).

After conducting a careful and complete review of the findings, conclusions and recommendations, and giving *de novo* review to matters of law, the Court accepts the factual findings and legal conclusions of the magistrate judge and the recommendation of the magistrate judge.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DE-CREED:**

(1) The report and recommendation of Thomas B. McCoun, United States Magistrate Judge (Doc. # 43) is **ACCEPTED** and **ADOPTED.**

(2) Plaintiffs' Motion for Preliminary Injunction (Doc. # 5) is **GRANTED.**

## REPORT AND RECOMMENDATION

THOMAS B. McCOUN III, United States Magistrate Judge.

THIS CAUSE is before the Court on referral for a Report and Recommendation on **Bentley's Motion for Preliminary Injunction and Memorandum in Support** (Doc. 5) and **Matthew McEntegart's Declaration in Response to Motion for Preliminary Injunction** (Doc. 35).[1] A hearing on the Motion was conducted September 10, 2012. For the reasons set forth herein, I recommend the Motion be **GRANTED.**

Bentley Motors Limited Corporation is a foreign corporation organized under the laws of Great Britain. Bentley Motors, Inc. is a corporation organized under the laws of Delaware. These corporations, collectively referred to herein as "Bentley," manufacture, distribute, sell and service high-end automobiles. Fugazzi Cars, Inc. ("Fugazzi") is a Florida corporation operating in St. Petersburg, Florida. Matthew McEntegart ("McEntegart") is the owner and operator of Fugazzi. Fugazzi has not made an appearance in this action. McEntegart, appears *pro se.* Keeping it Real Auto Customizing, Inc. ("Keeping it Real") is a Florida corporation operating in Clearwater, Florida. Its owner and operator is Robert Frary, III ("Frary").

By its Verified Complaint filed in July 2012, Bentley sues Defendants for counterfeiting, infringement and dilution of Bentley's trademarks and trade dress rights in the inherently distinctive shape of Bentley vehicles, particularly the Continental GTC vehicle, and for infringement of Bentley's United States Design Patent (D570,738S) in the ornamental design of its vehicles. In short, Bentley alleges that Defendants unlawfully manufacture Bentley body kits that transform ordinary and inexpensive Chrysler Sebring and Ford Mustang automobiles into knock-off Bentley vehicles by intentionally misappropriating the overall appearance and shape of the Bentley GTC automobile and Bentley trademarks, including copies and colorable imitations thereof, and incorporating them into Bentley car kits. By its allegations, Defendants continue to manufacture, advertise and sell these kits despite Bentley's cease and desist demands. (Doc. 1). Bentley sues Defendants in four counts for: (1) trademark dilution under 15 U.S.C. § 1125(c); (2) trademark infringement and counterfeiting under 15 U.S.C. § 1114(1); (3) false advertising, false designation of origin and trade dress infringement under 15 U.S.C. § 1125(a); (4) and design patent infringement under 35 U.S.C. § 271.[2] Among other relief sought, Bentley seeks preliminary and permanent injunction against further infringement. *Id.*

### I.

By its motion for injunctive relief, Bentley seeks issuance of a preliminary injunction under the Lanham Act, precluding Defendants from acts of (1) trademark infringement under 15 U.S.C. § 1114(1)(a); (2) trade dress infringement under 15

---

**1.** Additionally, the parties filed affidavits and other documentary evidence. (Docs. 32, 37, 38). Bentley also introduced a number of composite exhibits at the hearing.

**2.** As of this date, none of the Defendants have filed an Answer to Complaint. Defendants Frary and Keeping It Real both filed Motions to Dismiss. *See* (Docs. 30 and 31).

U.S.C. § 1125; and (3) trademark dilution under 15 U.S.C. § 1125(c)(1). Bentley again argues that the Defendants' transformation of model year 2001 through 2006 Chrysler Sebring automobiles into knock-off or imitation Bentley Continental GTC automobiles causes irreparable harm to its goodwill because when the public views the imitation Bentley vehicles made with Defendants' car body kits, they will mistakenly believe that the unsurpassed quality and reputation of genuine Bentley vehicles have deteriorated. Despite Defendants' claims that they have not engaged in the manufacture, advertisement, sale and/or distribution of the offending body-kits since receiving Bentley's cease and desist letter, and despite any disclaimer employed by Defendants, injunctive relief is necessary. Bentley seeks preliminary injunctive relief requesting that Defendants and all of their officers, directors, agents, servants, and employees are:

a. Enjoined and restrained from manufacturing, advertising, marketing and/or selling car body kits and/or replica cars that use, copy, misappropriate the following trademarks: BENTLEY®, the Bentley BTM, and the B IN WINGS®, and/or the trade dress of any Bentley vehicle.

b. Enjoined and restrained from otherwise violating Bentley's trademark and trade dress rights.

c. Enjoined and restrained from instructing, assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities mentioned above.

d. Ordered and directed, pursuant to 15 U.S.C. § 1118, to deliver to Bentley all vehicles, body kits, products, labels, tags, signs, prints, packages, videos, and advertisements in their possession or under their control, bearing or using any or all of the Bentley trademarks and/or trade dress, and all plates, molds, matrices and other means of making the same.

e. Ordered and directed to contact all dealers or other distributors of their products, or any advertisers of Defendants' products, provide them with a copy of the Order and Preliminary Injunction, and request that all dealers or other distributors, or any advertisers of their products turn over to Bentley any replica Bentley vehicles and/or Bentley kits, and to remove any advertisements or other materials advertising Defendants' replica Bentley vehicles and/or Bentley kits.

f. Ordered and directed to post and/or publish a complete and unedited copy of this Order and Preliminary Injunction on their respective web-page(s) and on any other website (including, but not limited to Facebook and/or any other social media site) where Defendants have previously published, posted, marketed, advertised, and/or commented with respect to the Defendants' replica Bentley vehicles and/or Bentley kits.

*See* (Doc. 41–1 at 23–24).[3]

In response, Defendant Frary urges that the only involvement of his company, *Keeping it Real*, was painting three of Fugazzi's vehicles and that he was not aware that painting vehicles for Fugazzi was inappropriate.[4] Moreover, Defen-

---

**3.** At the conclusion of the hearing, the Court requested Bentley to submit a statement outlining the injunctive relief sought. Bentley submitted both that and its proposed findings and conclusions of law. *See id.* I do not herein address those proposed findings. Mr. McEntegart submitted an objection to one aspect of the injunction requested. (Doc. 42).

**4.** Frary urges that since all of the allegedly offensive actions were done by his company,

dants Frary and Keeping it Real argue that they never received a cease and desist order from Defendants and did not learn of the same until suit was filed. In explanation of some of Bentley's proffered exhibits, Frary contends that they advertised for Fugazzi on Facebook and other websites only because they were promised further paint work if any job sold. *See* (Doc. 37).

Defendant McEntegart responds that he created a car body plug in late 2011 or early 2012 from his own imagination which fit over the chassis of a Chrysler Sebring. When his product was sold, it was called the "Sebring Wide Body." He urges that in making the Sebring Wide Body, he did not copy the Bentley GTC. Furthermore, he contends there are a number of material differences in the dimensions and appearance of the two vehicles. Further, he denies that he ever passed-off or advertised the Sebring Wide Body as a Bentley GTC or any other vehicle, and that he employed a disclaimer of such on his Facebook advertisement (prior to its discontinuation). He asserts that since receiving the Bentley cease and desist demand, he has voluntarily ceased the manufacture and distribution of the car body kits, and has removed his advertisements by unpublishing his Facebook postings. Defendant McEntegart contends that when he receives inquiries for the Sebring Wide Body, he replies that none are available and that he no longer produces them. He alleges that any remaining existing postings or advertisements are not made by him and are beyond his ability to control. Finally, Defendant McEntegart argues that while he did incorporate the entity, Fugazzi Cars, Inc., he never started up the business; thus, the alleged violations of

the Lanham Act were done by him, individually. *See* (Doc. 35).

None of the Defendants object to the entry of a preliminary injunction, although both contend such an action is unnecessary given that all such allegedly offending activity has ceased and is not likely to occur again. Bentley argues that any disclaimer employed by Defendants is no cause to deny an injunction, and they urge that an injunction is still necessary to assure there is no recurrence. In support, Bentley cites to the inability to resolve the dispute with all Defendants without filing suit and to certain comments made by the Defendants on their Facebook pages, such as, that they were just laying low until Bentley went away.

## II.

■■■ Rule 65 of the Federal Rules of Civil Procedure governs the entry of a preliminary injunction. The purpose of a preliminary injunction is to maintain the *status quo* until the court can enter a final decision on the merits of the case. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir.2011). A party seeking entry of a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011).

■■■ "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly es-

he should not be named as an individual Defendant. However, because the proffered evidence suggests greater involvement in the advertisement, promotion and even manufac-

ture of the knock-off vehicles by both Frary and his company, I conclude both may be subject to the action for injunctive relief.

tablishes the burden of persuasion as to the four requisites." *Id.* (quoting *ACLU of Fla., Inc. v. Miami–Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir.2009)). The entry of a preliminary injunction is "the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir.2000) (citations omitted). A plaintiff may support its motion for a preliminary injunction by setting forth allegations of specific facts in affidavits. M.D. Fla. R. 4.06(b)(2), 4.06(b)(3). In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir.1995).

### III.

 Bentley urges that it is entitled to preliminary injunctive relief under each of its Lanham Act claims. As for the claim brought at Count II for trademark infringement under 15 U.S.C. § 1114(1)(a), (2), that provision provides in pertinent part,

(1) Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a).[5] Thus, in order to succeed on a trademark infringement claim, Bentley must show, "first, that its

mark is valid and, second, that defendant's use of the contested mark is likely to cause confusion." *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989) (citing 15 U.S.C. § 1114(1)(a)); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491 (11th Cir.1983).

 Bentley also relies on its claim at Count III for trade dress infringement and false designation of origin under 15 U.S.C. § 1125(a) to support their claim of a preliminary injunction. That provision provides in pertinent part,

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or....

15 U.S.C. § 1125(a). This section creates a federal cause of action for trade dress infringement. *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1202 (11th Cir.2004) (citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986)). A successful claim of trade dress infringement requires that the plaintiff prove that, "(1) the product design of the two products is confusingly similar; (2) the features of the product design are primarily non-functional; and (3) the product design is inherently distinctive or has acquired secondary meaning. *Id.* (citing *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir.1996)).

---

**5.** Subsection 2 provides certain limitations on remedies, which is unnecessary for discussion here.

■ Finally, Bentley relies on its claim at Count I for trademark dilution under 15 U.S.C. § 1125(c)(1) to support its claim for injunction. That section provides,

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1). In order to prevail on a federal dilution claim, the plaintiff must establish four elements: "(1) the plaintiff's mark is famous; (2) the defendant used the plaintiff's mark after the plaintiff's mark became famous; (3) the defendant's use was commercial and in commerce; and (4) the defendant's use of the plaintiff's mark has likely caused dilution." *Rain Bird Corp. v. Taylor,* 665 F.Supp.2d 1258, 1266–67 (N.D.Fla.2009) (citing *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 633 (9th Cir.2008)); *see also HBP, Inc. v. Am. Marine Holdings, Inc.,* 290 F.Supp.2d 1320, 1338 (M.D.Fla.2003) (citing *Portionpac Chem. Corp. v. Sanitech*

*Sys., Inc.,* 217 F.Supp.2d 1238, 1250–51 (M.D.Fla.2002)).

### A.

Initially, I find it unnecessary to reach the issues under the dilution claim in Count I. Given the lack of opposition to the entry of an injunction and my conclusion that Bentley adequately demonstrates that it is entitled to injunctive relief under the trademark infringement and trade dress infringement claims in Counts II and II, I find it unnecessary to do more on this Motion.

On the matter of its likelihood of success on the merits, Bentley urges that under authority of the Lanham Act, courts have uniformly enjoined the manufacture, advertisement and sale of kit cars and body kits that transform ordinary vehicles into knock-off versions of expensive and famous vehicles.[6] Here, it urges that the undisputed evidence shows that Mr. McEntegart created and used a car body kit to transform ordinary Chrysler Sebring vehicles into lookalike Bentley Continental GTC models. In doing so, Defendant McEntegart infringed the Bentley Marks and trade dress directly or by using confusingly similar marks and design features. Thereafter, Defendants both installed the kits themselves and actively promoted the same at car shows and/or advertised and sold the kits via the internet.[7]

---

**6.** In legal support, Bentley cites the following cases: *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts,* 944 F.2d 1235, 1240 (6th Cir.1991); *Gen. Motors Co. v. Urban Gorilla, LLC,* No. 2:06–CV–00133BSJ, 2010 WL 5395065 (D.Utah Dec. 27, 2010); *Gen. Motors Corp. v. Phat Cat Carts, Inc.,* 504 F.Supp.2d 1278 (M.D.Fla.2006); *Gen. Motors Corp. v. Let's Make a Deal,* 223 F.Supp.2d 1183 (D.Nev.2002); *Rolls–Royce Motors Ltd. v. A & A Fiberglass, Inc.,* 428 F.Supp. 689 (N.D.Ga.1977); *Ferrari S.p.A. Esercizio Fabbriche Automobili Corse v. McBurnie,* 11 U.S.P.Q.2d (BNA) 1843 (S.D.Cal.1989); *Rolls–Royce Motors Ltd. v. Custom Cloud Mo-*

*tors, Inc.,* 190 U.S.P.Q. 80 (BNA) at 2–4 (S.D.N.Y.1976). *See* (Doc. 5 at 15–16).

**7.** At this point, the evidence supports that each of the Defendants played an active role in promoting, and in some instances, building the Fugazzi vehicles. Despite their protests to the contrary, Mr. Frary and Keeping it Real appear to have done more than just paint three vehicles; they actively assisted, promoted and sold the Fugazzi kit vehicles on online forums and on Keeping it Real's Facebook page. *See, e.g.,* (Docs. 1–1 to 1–4, 1–12, 32–6 to 32–8, 32–16); *see also* Plaintiff's Exh. 4 to the hearing (a video showing both

By my consideration, Bentley is substantially likely to prevail on its claims for trademark and trade dress infringement. Here, there is no present dispute that Bentley is the registered owner of the trademarks, BENTLEY® and the B IN WINGS®, issued by the United States Patent and Trademark Office. *See* (Doc. 1–6). Moreover, Bentley is the owner of the Bentley BTM, despite it being an unregistered trademark. *Bauer Lamp Co., Inc. v. Shaffer,* 941 F.2d 1165, 1171 (11th Cir.1991) ("Under the Lanham Act such registration is not necessary ... trademark protection accrues with use...."). In addition, there is no claim that Bentley consented to Defendants' use of their marks or any colorable imitation of their marks. While Defendant McEntegart claims that he always replaced the "B" in the B IN WINGS® mark with a "F," several of the proffered exhibits depict otherwise. *See, e.g.,* (Docs. 1 at 8; 1–1 at 3–4; 1–3 at 4; 1–4 at 1–2, 4–5; 5 at 7); *but see* Exh. 2 and 3. Even by McEntegart's version, it can hardly be disputed that his depiction and use of the "F" in Wings hood ornament is a copy and colorable imitation of Bentley's B IN WINGS® mark likely to harm Bentley's good will. *See* Exh. 2 and 3. Moreover, as discussed below, Bentley also adequately demonstrates the likelihood of confusion element.

As for the trade dress claim, the Eleventh Circuit recognizes that the design of the product itself may constitute protectable trade dress under § 43(a) of the Lanham Act. "The term 'trade dress' refers to the appearance of a product when that appearance is used to identify the product." *Dippin' Dots, Inc.,* 369 F.3d at 1202. As this claim is presented on this Motion, there is no issue that the features of the product design are primarily nonfunctional, nor any contrary evidence to Plaintiff's allegations that its trade dress is inherently distinctive or has developed secondary meaning[8] On the element of confusion, for the reasons which follow, there is adequate demonstration that the product designs of the Bentley Continental GTC automobile and the Fugazzi knock-off are confusingly similar.

In this Circuit, the "determination of the likelihood of confusion requires analysis of the following seven factors: (1) type of mark, (2) similarity of mark, (3) similarity of the products the mark represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media used, (6) defendant's intent, and (7) actual confusion." *Dieter,* 880 F.2d at 326. "Of these factors, the type of mark and the evidence of actual confusion are the most important in this circuit." *Id.* (citing *Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176, 1182 (11th Cir.1985), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985)). However, case law

---

McEntegart and Frary installing a body panel on a Chrylser Sebring).

**8.** By its Verified Complaint, Bentley has, since 1919, used its marks in connection with the sale, distribution, and maintenance of its distinctive automobiles, under standards assuring the highest quality for its products. Further, it has spent millions of dollars to promote its product and has established considerable goodwill in it marks. In short, its marks are widely known and famous throughout the world as symbols of high quality automotive goods and services and have acquired secondary meaning. These verified allegations have not yet been disputed or refuted.

Case law dictates that a design in the public domain may be freely copied unless such design is the subject of a design patent "or other federal statutory protection," in which case it may not be copied. *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 238, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *see Ferrari S.P.A. v. Roberts,* 944 F.2d at 1241 ("Lanham Act protection is available to designs which also have been covered by design patents as long as the designs have acquired secondary meaning.").

also dictates that concurrent use of a mark in commerce without consent poses a substantial likelihood of confusion among consumers. *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.,* 303 F.3d 1242, 1248–49 (11th Cir.2002) ("There can be no dispute that the parties' concurrent use of the ... mark poses a substantial likelihood of confusion among consumers."); *Phat Cat Carts, Inc.,* 504 F.Supp.2d at 1283 (ruling that defendants' continued use of identical marks shows a likelihood of confusion among the public). In any event, as noted in *Phat Cat,* "[t]he 'likelihood of confusion test' does not require that a plaintiff prove that consumers would likely confuse the alleged infringer's product with the real product. In order to meet the 'likelihood of confusion test,' it is sufficient for a plaintiff to show that the unauthorized use of the trademark has the effect of misleading the public to believe that the user is sponsored or approved by the plaintiff." 504 F.Supp.2d at 1284.

■ Finally, the standards are equally applicable to the trademark infringement and trade dress claim since "the factors relevant to determining whether there is a likelihood of confusion between the trade dress of two products are 'essentially the same' as those relevant to determining whether there is a likelihood of confusion between the parties' trademarks." *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 981 (11th Cir.1983) (citing *Sun-Fun Prod., Inc. v. Suntan Research & Dev. Inc.,* 656 F.2d 186, 192 (5th Cir. Unit B 1981)).

Here, as noted above, there is some demonstration of concurrent use of the marks, which assumes customer confusion. Even in the absence of concurrent use of the marks, the applicable considerations militate in favor of a finding of likelihood of confusion at this stage of the litigation. Thus, while there is no showing of similarity in the parties' retail outlets and customers or advertising media used, the similarity of the "F" in Wings mark, the similarity of the automobile products the mark represent,[9] the Defendant's intent,[10] and the evidence of some actual confusion are sufficient on this Motion to support the conclusion of a likelihood of confusion.

In terms of the proffered evidence on confusion, beyond the evidence of Defendants' concurrent use of the Bentley BTM and the B IN WINGS® mark, Bentley adequately demonstrates that Defendants' unauthorized use of copies and colorable imitations of its marks and design has caused and is likely to cause confusion, mistake, or to deceive. Thus, Bentley identifies several consumer expressions reflecting the especial similarity of the products and confusion between Defendants' vehicles and the actual Bentley Continental GTC. For example, on February 17, 2012, a Ted Parkes posted on Keeping it Real's Facebook page a picture of a genuine Bentley Continental GTC, stating, "Almost thought this one was you guys when it passed me...." [11] (Doc. 1–8). Moreover, Bentley proffers several online articles discussing the resemblance of Defendants' vehicles to the genuine Bentley Continental GTC which suggest the likeli-

---

9. McEntegart points out that there are a number of differences in the products, but the overall design and appearance of the Fugazzi and its ornamentation are shown to be quite similar.

10. McEntegart insists that he did not set out to copy Bentley in his creation of the Sebring Wide Body kit, but the substantial similarity

in the overall appearance and the use of similar ornamentation belies that claim.

11. Parks also indicated that recognized the difference as the one he saw had the "the real Bentley rims, and chrome trim around the windows." He urges "you need to add the trim and yours would be almost exactly the same." (Doc. 1–8).

hood of consumer confusion. On November 11, 2011, carmabrand.com reported seeing Defendants' vehicle at the 2011 SEMA show in Las Vegas, and stated, "Someone would literally have to tell you it was a phony, even the interior seemed to be spot-on." (Doc. 1–10 at 4). On November 18, 2011, auto123.com also reported seeing Defendants' vehicle at the SEMA show, writing, "The Continental GTC is actually a Chrysler Sebring Convertible that underwent a makeover so thorough and realistic that it's nearly impossible to tell the difference. We sure were fooled when we spotted the car earlier this month...." (Doc. 1–9).

Given the evidence of concurrent use of the marks and of some apparent actual confusion, Bentley adequately demonstrates the element of substantial likelihood of confusion to support both the trademark infringement and trade dress infringements claims. Coupled with the evidence of infringement, I conclude Bentley is substantially likely to prevail on these claims. *See, e.g., Ferrari S.P.A. v. Roberts*, 944 F.2d 1235 (holding that defendant's car kits that replicate exterior features of Ferrari vehicles are considered trademark infringement); *Let's Make a Deal*, 223 F.Supp.2d 1183 (holding that defendant's car kits that capture the unique characteristics of Hummer vehicles are considered trademark and trade dress infringement).

B.

Bentley urges that the wrongful use of its marks or confusingly similar marks "dilutes, tarnishes, and whittles away the distinctiveness of the Bentley Marks." (Doc. 5 at 11). It urges that the harm is irreparable because Defendants' actions lessen the capacity of the Bentley marks to designate its goods and services. Moreover, since it has no control over the quality of goods that Defendants are offering the public, if such goods reflect shoddy workmanship, Bentley will be harmed by the public perception that its unsurpassed quality has deteriorated and its reputation for high-quality vehicles and service will be damaged.[12]

The Eleventh Circuit has long held that a presumption of irreparable harm arises once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim. However, in *North American Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227–28 (11th Cir.2008), the Eleventh Circuit determined that after the Supreme Court's decision in *eBay v. MercExchange*, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), such a presumption may not pertain to preliminary injunctions under the Lanham Act. Nonetheless, I conclude that even in the absence of such presumption, Bentley establishes irreparable harm to its marks, the accompanying goodwill, and its reputation to support its claim for injunctive relief. " 'Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. Irreparable injury can also be based upon the possibility of confusion.' " *Ferrellgas Partners, L.P. v. Barrow*, 143 Fed.Appx. 180, 190 (11th Cir.2005) (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir.1998) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir.1990) (holding that the lack of control over one's mark

---

12. In legal support of its claim of irreparable harm, Bentley cites the following cases: *Chanel, Inc. v. Chanel255.org*, No. 12–21762–CIV, 2012 WL 1941598, at *6 (S.D.Fla. May 29, 2012); *Nike, Inc. v. Austin*, No. 6:09–cv–796– Orl–28KRS, 2009 WL 3535500, at *5–6 (M.D.Fla. Oct.28, 2009); *Chanel, Inc. v. Mesadieu*, No. 6:08–cv–1557–Orl–31KRS, 2009 WL 2496586, at *8 (M.D.Fla. Aug. 12, 2009). *See* (Doc. 5 at 23–24).

"creates the potential for damage . . . reputation [, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case."))). As Professor McCarthy has stated, "[a] likelihood of damage to reputation is by its nature 'irreparable.' Like trying to unring a bell, trying to compensate after the fact for damage to business goodwill and reputation cannot constitute a just and full compensation." 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:47 (4th ed. 1994). Bentley's quote from *Liquid Glass Enterprises, Inc. v. Porsche AG*, sums it up well,

> 'grounds for irreparable harm include loss of control of reputation, loss of trade, and loss of goodwill,' regardless of whether the infringer is putting the mark to a good or favorable use. Liquid Glass's unauthorized use of the Porsche marks inhibits Porsche's ability to control which products its reputation and good will are being used to promote or endorse. This lack of control and potential damage to Porsche's reputation constitutes irreparable injury because monetary damages cannot adequately compensate for harm to good will or reputation.

8 F.Supp.2d 398, 406 (D.N.J.1998) (internal citations omitted).

Here, Bentley adequately demonstrates that to the extent Defendants have used its marks in commerce and may do so again,[13] there is a likelihood of confusion, and its existing goodwill and reputation with the consuming public are potentially threatened. Because it has no control over the quality of goods Defendants offer, there is a risk that the public perception of its high-quality products will be diminished if Defendants are allowed to continue the sale and distribution of the Fugazzi knock-offs. Thus, I conclude Bentley has adequately demonstrated irreparable harm as well.

### C.

■ As for the balancing of harms, Bentley's probable loss of consumer goodwill and any damage to its reputation outweigh the harm to Defendants should they be enjoined from making, selling and distributing the Sebring Wide Body kits. *See Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir.2001) ("Regarding the balancing of potential harms . . . the probable loss of consumer goodwill for [plaintiff] outweighs the cost of delay that [defendant] will incur in not being able to sell . . . ."). As noted above, the Defendants do not oppose an injunction and apart from Fugazzi, none of the Defendants will be otherwise barred from

**13.** The threat of a recurrence of this activity by these Defendants appears low. However, while Defendants assure the Court that all such offending activity has ceased and will not be resumed, there were claims made publicly via the internet that they were just laying low until Bentley went away. *See, e.g.,* (Docs. 1–1 at 6, 32–9 at 2). Moreover, it appears that efforts to settle the matter prior to bringing the matter to Court did not succeed. Such circumstances suggest the safer course is the entry of injunctive relief to assure the status quo. *See Polo Fashions, Inc. v. Bruhn, Inc.*, 793 F.2d 1132, 1135–36 (9th Cir.1986) ("We should not require Polo also to introduce concrete evidence that the defendants

are likely to infringe again. If the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives Polo substantial protection of its trademark."); *see also Buffets, Inc. v. LVDC II, Inc.*, No. 8–11–cv–00035–T–30MAP, 2011 WL 3664548, at *6 (M.D.Fla. Aug. 16, 2011) (citing *Polo Fashions*, 793 F.2d at 1135–36) ("The Lanham Act permits issuance of injunctive relief to prevent future harm. Proof of future harm is not required where defendants have infringed on a registered mark."); *Hogar C.R.E.A. Int'l of Fla., Inc. v. Hogar C.E.R.A. Inc. of Fla.*, No. 6–10–cv–1629–Orl–31DAB, 2011 WL 1988810, at *4 (M.D.Fla. May 5, 2011).

**1304**

carrying on their otherwise lawful businesses.

**D.**

▮ Finally, "the injunction is not adverse to the public interest, because the public interest is served by preventing consumer confusion in the marketplace." *Id.* (citing *SunAmerica Corp. v. Sun Life Assurance Co. of Can.,* 77 F.3d 1325, 1334 (11th Cir.1996)).

**IV.**

For the foregoing reasons, it is recommended that Bentley's Motion for Preliminary Injunction and Memorandum in Support (Doc. 5) be **GRANTED** and that a preliminary injunction be issued against the Defendants, their principals, employees, agents and assigns and all others acting through them on the following terms:

1) enjoining them from manufacturing, advertising, marketing and/or selling car body kits and/or replica cars that use, copy, misappropriate the following trademarks: BENTLEY®, the Bentley BTM, and the B IN WINGS®, and/or the trade dress of any Bentley vehicle;

2) enjoining them from otherwise violating Bentley's trademark and trade dress rights;

3) ordering Defendants to collect up and store in a secure location, pending further order of this Court or the bankruptcy court, all Fugazzi wide body vehicles or replica Bentley vehicles, body kits for the same, molds and body-plugs for these products, and any labels, tags, signs, prints, packages, videos, and advertisement and promotional materials for the same in their possession or under their control, and barring any use of the same for any purpose absent court permission;

4) ordering Defendants to provide to any dealer or distributor or advertiser of the Fugazzi wide body vehicles or replica Bentley vehicles or kits for the same a copy of the injunction entered by this Court, along with a written demand that any such dealer or distributor or advertiser cease further promotion of the vehicles or kits for the same and demanding return to McEntegart any Fugazzi wide body or replica Bentley vehicles and/or kits for the same, along with any promotional materials; and

5) ordering Defendants to post a complete and unedited copy of the injunction on their respective web-page(s) and on any other website (including, but not limited to Facebook and/or any other social media site) where Defendants have previously published, posted, marketed, advertised, and/or commented with respect to the Defendants' Fugazzi wide body or replica Bentley vehicles and/or Bentley kits.

6) Bond in the amount of $10,000 or less appears appropriate.